# Exhibit 2
# Deposition of
# Officer Campbell

Deposition of Officer Curt Campbell                                                    March 3, 2006



Page 1

1        IN THE UNITED STATES DISTRICT COURT
2        FOR THE MIDDLE DISTRICT OF ALABAMA
3                 NORTHERN DIVISION
4
5    J.S., (a minor child by
     and through his father and
6    next friend, JOHN SEAWRIGHT),
7         Plaintiff,
8    Vs.              CIVIL ACTION NO.
                      02:05-CV-928-WKW
9    OFFICER CURT CAMPBELL, in
     his individual capacity,
10
         Defendant.
11
12        * * * * * * * * * * * * *
13
14       DEPOSITION OF OFFICER CURT CAMPBELL, taken
15   pursuant to stipulation and agreement before Pamela
16   A. Wilbanks, Registered Professional Reporter and
17   Commissioner for the State of Alabama at Large, in
18   the Richardson Legal Center, 133 Hayneville Plaza,
19   Hayneville, Alabama, on Friday, March 3, 2006,
20   commencing at approximately 12:50 p.m.
21
22        * * * * * * * * * * * * *
23

Page 2

1              APPEARANCES
2    FOR THE PLAINTIFF:
3    Mr. Jay Lewis
     LAW OFFICES OF JAY LEWIS & ASSOCIATES
4    Attorneys at Law
     847 South McDonough Street
5    Suite 100
     Montgomery, Alabama
6
     FOR THE DEFENDANT:
7
     Mr. S. Mark Dukes
8    NIX, HOLTSFORD, GILLILAND, HIGGINS & HITSON
     Attorneys at Law
9    4001 Carmichael Road - Suite 300
     Montgomery, Alabama 36106
10
     ALSO PRESENT:
11
     Mr. and Mrs. Searight
12   John Searight, Jr.
13
          * * * * * * * * * * * * *
14
         EXAMINATION INDEX
15
     BY MR. LEWIS . . . . . . . . . .   4
16   BY MR. DUKES . . . . . . . . . .  88
     BY MR. LEWIS . . . . . . . . . .  89
17
          * * * * * * * * * * * * *
18
         PLAINTIFF'S EXHIBIT INDEX
19
20
     1  Incident/Offense Report . . . . . . . 24
21
     2  Diagram of site of occurrence . . . . 31
22
23

Page 3

1                  STIPULATION
2         It is hereby stipulated and agreed by and
3    between counsel representing the parties that the
4    deposition of OFFICER CURT CAMPBELL is taken pursuant
5    to the Federal Rules of Civil Procedure and that said
6    deposition may be taken before Pamela A. Wilbanks,
7    Registered Professional Reporter and Commissioner for
8    the State of Alabama at Large, without the formality
9    of a commission, that objections to questions other
10   than objections as to the form of the question need
11   not be made at this time but may be reserved for a
12   ruling at such time as the said deposition may be
13   offered in evidence or used for any other purpose by
14   either party provided for by the Statute.
15        It is further stipulated and agreed by and
16   between counsel representing the parties in this case
17   that the filing of said deposition is hereby waived
18   and may be introduced at the trial of this case or
19   used in any other manner by either party hereto
20   provided for by the Statute regardless of the waiving
21   of the filing of the same.
22        It is further stipulated and agreed by and
23   between the parties hereto and the witness that the

Page 4

1    signature of the witness to this deposition is hereby
2    not waived.
3
4         * * * * * * * * * * * * *
5          OFFICER CURT CAMPBELL
6         The witness, after having first been duly
7    sworn to speak the truth, the whole truth and nothing
8    but the truth testified as follows:
9                  EXAMINATION
10   BY MR. LEWIS:
11   Q.   State your name, please.
12   A.   T. C. Campbell.
13   Q.   Officer Campbell, my name is Jay Lewis. We've
14        met before in court. I'm here to take your
15        deposition in the case about which we're here,
16        and that is, of course, Searight versus
17        Campbell.
18        Have you ever had your deposition taken
19        before?
20   A.   Yes.
21   Q.   In what case or cases?
22   A.   Vehicle accident where an individual died.
23   Q.   Were you involved as a party in that case?

Haislip, Ragan, Green, Starkie & Watson, P.C.
(334) 263-4455

Page 5

1   A.  No.  I was -- I came out and photographed the
2       scene.
3   Q.  You were a police officer at the time?
4   A.  Correct.
5   Q.  Kind of the same stuff that Mark was talking
6       about in the previous deposition.  I don't
7       really have any worries about this, but if
8       you'll speak up and make all of your answers
9       verbal rather than nodding or shaking your
10      head or saying uh-huh or huh-uh, we'll get
11      along a lot better.
12          If you will stop me if I ask a question
13      that you don't understand or use a word that
14      you don't understand or in a context with
15      which you're unfamiliar, I will try to make it
16      right.  Anytime you want to take a break,
17      we'll take a break.  Anytime you want to talk
18      to your lawyer, as long as there's not a
19      question on the table at that time, talk to
20      your lawyer.  If I'm asking you a about
21      something that I inadvertently ask you that
22      involves attorney-client privilege and it's
23      not immediately obvious from the way I'm

Page 6

1       asking it and you want to talk about whether
2       or not that is privileged, just stop me right
3       there, talk to your lawyer, and we'll stop and
4       let you confer on that.
5           I ask the same question of everybody.  Are
6       you under the influence of alcohol or other
7       substances, including prescription
8       medications, that might affect your ability to
9       understand the questions I'm asking and give
10      an accurate, truthful response?
11  A.  No, I'm not.
12  Q.  Have you ever been arrested?
13  A.  No, I haven't.
14  Q.  Ever been charged with a crime, whether or not
15      the charge ended up in an arrest?
16  A.  Yes, I have.
17  Q.  And what were you charged with?
18  A.  Reckless endangerment.
19  Q.  When was that?
20  A.  August 2, 2002.
21  Q.  Tell me the circumstances of that, please.
22  A.  I was at the restaurant in Fort Deposit out
23      near -- between the Shell station and the BP

Page 7

1       station, and we were horseplaying.  And I
2       pulled my gun out in a joking manner, and the
3       owner of the restaurant saw fit to charge me
4       with reckless endangerment.
5   Q.  With whom were you horseplaying?
6   A.  Jamie Betts and Lenay (phonetic) from
7       Emergystat.
8   Q.  Both of those were from Emergystat Ambulance
9       Service?
10  A.  That's correct.
11  Q.  What was the disposition of that charge?
12  A.  It was dismissed.
13  Q.  At the time you went to court?
14  A.  Yes.
15  Q.  Any other charges or arrests?
16  A.  No, sir.
17  Q.  At that time on August 2, 2002, were you a
18      police officer in the employ of the City of
19      Fort Deposit?
20  A.  Yes, I was.
21  Q.  Let's go back and get a little background, if
22      I may.
23          What's your address?

Page 8

1   A.  741 Edgewood Drive.
2   Q.  And that is in Fort Deposit?
3   A.  Yes, sir, it is.
4   Q.  What's your social security number?
5   A.  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.
6   Q.  Date of birth?
7   A.  June 7 of 1966.
8   Q.  How long have you lived in Fort Deposit?
9   A.  Two years, nine months.
10  Q.  Have you ever served in the military?
11  A.  No, sir, I haven't.
12  Q.  Let's start back, if you will.  Where did you
13      go to high school?
14  A.  Greenville High School in Greenville, Alabama.
15  Q.  Do you consider yourself to be from
16      Greenville?
17  A.  Yes.
18  Q.  Were you born there?
19  A.  No, sir.
20  Q.  Where were you born?
21  A.  Detroit, Michigan.
22  Q.  When did you move to Greenville?
23  A.  1968, I think.

2 (Pages 5 to 8)

Deposition of Officer Curt Campbell

March 3, 2006

Page 9

1　Q.　About two years old?
2　A.　Correct.
3　Q.　And you've been in Alabama since then?
4　A.　That's correct.
5　Q.　What year did you graduate from Greenville
6　　　High School?
7　A.　1984.
8　Q.　I don't want to know the part-time jobs you
9　　　had while you were in high school or
10　　delivering newspapers or anything like that,
11　　but I'd like to start with 1984 when you
12　　graduated from high school, and let's take
13　　your employment history forward from there.
14　　Okay?
15　　　　Where did you first work after you
16　　graduated from high school?
17　A.　I worked for the Greenville Parks and
18　　Recreation, 1986.
19　Q.　That's from what date to what date roughly?
20　A.　From 1986 to 1992 off and on, I mean, during
21　　the summers and whatnot. I was a lifeguard.
22　Q.　Were you going to college during that time?
23　A.　Yes. I went to college from '84 through '86.

Page 10

1　Q.　Where did you go to college?
2　A.　Alabama A & M University.
3　Q.　Did you graduate?
4　A.　No, I didn't.
5　Q.　What were you majoring in?
6　A.　Computer science.
7　Q.　You went to college from '84 through '86, and
8　　　you started working with the Greenville Parks
9　　　and Recreation Department in '86 through '92.
10　　And I assume that was seasonal work?
11　A.　Yes, sir.
12　Q.　And where else did you work between 1986 and
13　　1992?
14　A.　Self-employed as a barber.
15　Q.　Did you have your own shop?
16　A.　Yes.
17　Q.　Where was your shop?
18　A.　At my home.
19　Q.　Were you State licensed?
20　A.　No, I wasn't.
21　Q.　Are you aware of whether or not it's unlawful
22　　to hold yourself out as a barber without State
23　　certification and licensing?

Page 11

1　A.　No. I wasn't at the time.
2　Q.　It was not unlawful at the time?
3　A.　I wasn't aware.
4　Q.　Okay. That's fine.
5　　　　Starting in 1992 what did you do?
6　A.　I worked for the Montgomery Advertiser --
7　Q.　Doing what?
8　A.　-- to my knowledge.
9　　　　I was a stocker there.
10　Q.　In Montgomery?
11　A.　Yes.
12　Q.　What did you stock, like paper goods and --
13　A.　Yes, sir.
14　Q.　That was in 1992. How long did you work
15　　there?
16　A.　About four months.
17　Q.　Where did you go from there?
18　A.　Kirby. I worked for --
19　Q.　Sold Kirby vacuum cleaners?
20　A.　Yes, sir. I worked there for a few months.
21　Q.　And how about after that?
22　A.　My next employment was maybe 1994 or '5. I'm
23　　not totally sure. I don't distinctly remember

Page 12

1　　　back that far as far as what I did.
2　Q.　So what did you do after selling Kirby vacuum
3　　　cleaners?
4　A.　I began to work for Allied Signal in
5　　　Greenville, safety restraint systems.
6　Q.　Production work?
7　A.　Yes, sir. Inspecting.
8　Q.　And they make seat belts, right?
9　A.　That's what they make.
10　Q.　How about after that?
11　A.　We were laid off in '97 or '98, and I started
12　　work with the Fort Deposit Police Department.
13　Q.　So '97 or '98 you would have been with the
14　　Fort Deposit Police Department?
15　A.　Yes, sir.
16　Q.　Tell me how that works. What I'm asking is
17　　not what you did as a police officer, but when
18　　you decide to go to work for the Fort Deposit
19　　Police Department, do they hire you and then
20　　send you to the police academy?
21　A.　Yes, they do.
22　Q.　And once you finish the police academy, then
23　　you're certified as a police officer by the

3 (Pages 9 to 12)

Deposition of Officer Curt Campbell                                    March 3, 2006

Page 13

1      Peace Officers Standards and Training
2      Commission?
3   A.  That's correct.
4   Q.  And you went through all that certification
5      process?
6   A.  That's correct.
7   Q.  During that certification process and training
8      process, where did you go to the police
9      academy?
10  A.  In Ozark.
11  Q.  And that's the Southeast Alabama Law
12     Enforcement Training Academy?
13  A.  It's actually Southwest Alabama Police
14     Academy, but they had a class that they would
15     bring over to the southeast for a period of
16     time.
17  Q.  During that training process, did you have
18     courses in arrest procedures?
19  A.  Yes.
20  Q.  Did you have courses in sufficient law to
21     allow you to determine things like reasonable
22     suspicion and probable cause?
23  A.  Yes.

Page 14

1   Q.  Had some training in constitutional law,
2      Fourth Amendment, that sort thing?
3   A.  Yes.
4   Q.  And you made good grades in that?
5   A.  Yes, sir.  I made fairly good grades.
6   Q.  And you feel like you understand that
7      reasonably well?
8   A.  Yes.
9   Q.  Sufficiently to do a job as a police officer?
10  A.  Yes.
11  Q.  Have you been with the police department in
12     Fort Deposit ever since '97 or '98?
13  A.  Yes, sir.
14  Q.  Had any other jobs?  Part-time jobs, anything
15     like that?  Security jobs?
16  A.  On an occasion during the summertime, we do
17     security out at Carnes on U.S. 80.
18  Q.  What is Carnes?
19  A.  It's a maybe 30-acre stretch of land where
20     they hold concerts.
21  Q.  And so you provide security for events and
22     things?
23  A.  That's correct.

Page 15

1   Q.  With regard to the period of time that you've
2      been with the Fort Deposit Police Department,
3      have you ever been the subject of an ABI
4      investigation?
5   A.  Yes, I have.
6   Q.  Tell me about that.
7   A.  I was responding to a call for help from one
8      of my coworkers who was Officer Ashford Packer
9      at the time, at which time when I arrived to
10     Mr. Packer's aid, he explained to me what
11     happened as far as another juvenile entering
12     his vehicle and taking a gun without his
13     permission.  And he gave me the name of that
14     individual.
15  Q.  Mr. Packer was a police officer?
16  A.  That's correct.
17  Q.  Tell me what happened next.
18  A.  At which time I went out and attempted to
19     locate that individual.  And after several
20     trips by that individual's house, I noticed
21     that he wouldn't -- that he wasn't there.  I
22     returned to Randy's Wrecker Service and asked
23     Randy Adams could I borrow a vehicle that

Page 16

1      nobody would notice me in in an attempt to
2      locate that individual who had taken the gun
3      from -- out of Officer Packer's car, at which
4      point in time he gave me a truck, a GMC SUV,
5      gray in color, and I proceeded to Edgewood
6      Manor Apartments where the individual lived.
7      And I noticed that the window of that
8      individual's residence was up, and the
9      previous times it wasn't.
10        I exited my vehicle and walked up to that
11     house where a female by the name of Mrs. Joyce
12     Andrews exited the house in a wheelchair.  And
13     she stated that her son was not at home.  Her
14     door was wide open.  And in an effort for
15     safety, I noticed that I was exposed.  I was
16     just standing out in the open, and I
17     immediately ran to the side of her house and I
18     drew my weapon.  At that point -- Shortly
19     after that, Mrs. Andrews alleged that I pulled
20     a gun on her and henceforth the ABI
21     investigation.
22  Q.  What did the ABI investigation conclude?
23  A.  To my knowledge that there was no wrongdoing

4 (Pages 13 to 16)

Deposition of Officer Curt Campbell                                    March 3, 2006

---

Page 17

1   on my part.
2   Q.  When did that event that gave rise to the
3       investigation take place?
4   A.  Maybe April or May of 2004.
5   Q.  Any other incidents that gave rise to an ABI
6       investigation?
7   A.  Of me directly or --
8   Q.  Yes.
9   A.  Not to my knowledge.
10  Q.  How about Internal Affairs investigations at
11      the Fort Deposit Police Department?  Have you
12      ever been the subject of an investigation
13      other than what you just told me about with
14      regard to the April or May of '04 incident?
15  A.  Yes.
16  Q.  Tell me about each one of those.
17  A.  There was an allegation on April 15 of 2000
18      that I knowingly or willingly allowed an
19      individual to use my gun in the commission of
20      a crime.
21  Q.  In brief terms, just describe what happened
22      there.
23  A.  I allowed my cousin to use my truck to have a

---

Page 18

1       way to the nightclub, at which time I had a
2       firearm in the rear of my truck inside of a
3       bag.  He goes to the nightclub, works as
4       security personnel, and he goes to Subway
5       where several individuals were attempting to
6       attack him.  And out of his pocket comes my
7       firearm -- comes a firearm, to which I took
8       the firearm from that individual and
9       instructed him to go to the police station and
10      I'll deal with him later.
11  Q.  And you were there with him at the Subway?
12  A.  I was called to the Subway for crowd control
13      at 2 a.m.
14  Q.  So you took the weapon away from your cousin
15      and told him to go to the police station and
16      you would deal --
17  A.  Disarmed the weapon -- Took it from him,
18      disarmed it, and I sent him to the police
19      station because the other four individuals
20      were attempting to attack him and/or me.  So
21      in an effort for safety, I sent him to the
22      station and I tried to deal with the other
23      four.

---

Page 19

1   Q.  What was the finding of that IA investigation?
2   A.  There was no wrongdoing on my part.
3   Q.  Any other Internal Affairs investigations?
4   A.  To my knowledge, no.
5   Q.  Have you ever been written up or reprimanded,
6       disciplined, punished, suspended or in any
7       other way subjected to discipline at the Fort
8       Deposit Police Department?
9   A.  I was suspended.
10  Q.  What were you suspended for?
11  A.  I was suspended for the incident at the
12      restaurant.
13  Q.  Oh, for --
14  A.  The reckless endangerment.
15  Q.  How long were you suspended?
16  A.  I was suspended for a total of 17 days, eight
17      days the first time and nine days the second
18      time.
19  Q.  Explain to me why there were two separate
20      suspensions.
21  A.  After it was discovered that another officer
22      did the same exact thing.  Then in an effort
23      to be justified, they suspended us both with

---

Page 20

1       pay for nine days.
2   Q.  With pay?
3   A.  Correct.
4   Q.  What's your current rank with the Fort Deposit
5       Police Department?
6   A.  Now I'm just a patrol officer.
7   Q.  Have you ever held a higher rank than that?
8   A.  Yes.
9   Q.  What higher rank did you have?
10  A.  I was our investigator.
11  Q.  And tell me why you're now a patrol officer
12      and were an investigator?
13  A.  We have a new chief, and he saw fit to put me
14      back into patrol.
15  Q.  Was that a demotion?
16  A.  Yes.
17  Q.  Did you lose money as a result of that?
18  A.  No, I didn't.
19  Q.  Who is your police chief now?
20  A.  Chief Benjamin Turner.
21  Q.  Do you and Chief Turner get along okay?
22  A.  Pretty much so.
23  Q.  Who was the former chief?

---

5 (Pages 17 to 20)

Page 21

1    A.  Chief James Gulley.
2    Q.  You and Chief Gulley got along very well,
3        didn't you?
4    A.  Yes, we did.
5    Q.  He's always given you high performance ratings
6        and that sort thing?
7    A.  He gave me pretty favorable ratings to my
8        knowledge.
9    Q.  Has Chief Turner had an opportunity to
10       appraise your performance or have you received
11       any since he's been there?
12   A.  To my knowledge, he hasn't.
13   Q.  I have received -- I just want to go over a
14       couple of things here.  I've received this
15       Town of Fort Deposit municipal insurance
16       corporation policy.  As far as you know, are
17       you covered for liability by this policy?
18   A.  I should be.
19   Q.  What I'm asking is, as far as you know, either
20       the City of Fort Deposit or its insurer is
21       providing you defense in this case?
22   A.  Yes.
23   Q.  I want you to take a look at a set of

Page 22

1        documents, and I'll represent to you that they
2        were provided to us by your lawyer.  And they
3        are marked at the bottom Campbell, and it
4        starts with 00004 and it runs to 00074.  I'm
5        not going to make them an exhibit to this
6        because it would cost us a fortune to do
7        that.  But I want you to take a look at that
8        and tell me whether or not that appears to be
9        your personnel file.
10   A.  Yes, sir, it is.
11   Q.  As far as you know, is this a complete copy of
12       your personnel file?  I know that may be
13       unfair because you haven't had an opportunity
14       to read all the way through it, but does this
15       look like your complete personnel file that's
16       got your handgun training reports and some
17       letters of commendation and requests for leave
18       and certifications and that -- Does that seem
19       to be your complete report?
20   A.  As best I know, that's my personnel file.
21   Q.  Okay.  That's all we're going to do with that.
22          Now, we're here about an incident that
23       took place, I think the complaint says, June

Page 23

1        15 of 2005 -- but it may well have been May 15
2        of 2005 -- involving Mr. John Searight, Jr.
3        and yourself.  And I want to go ahead, if we
4        can, by stipulation --
5              MR. LEWIS:  I don't have a copy of
6           this, Mark.  This is the arrest
7           report that you provided us,
8           Campbell Documents 00001 through
9           00002, and I'd like to make those
10          an exhibit once we get a copy
11          made of it.  Okay?
12             MR. DUKES:  That's fine, but I
13          believe that's an incident/
14          offense report and not an arrest
15          report.
16             MR. LEWIS:  You're right.
17   Q.  It's an incident/offense report, and I think
18       the incident/offense report is normally one
19       sheet with documentation on both sides; is
20       that right?
21   A.  That's correct.
22   Q.  And what I have here is basically a photo copy
23       that's on two sheets, right?

Page 24

1    A.  That's correct.
2    Q.  Take a look at that, if you will -- and we'll
3        incorporate that as an exhibit by reference
4        and add it in later -- and tell me if that's
5        the incident/offense report, commonly called
6        an IO report, that relates to the incident
7        made the subject of this lawsuit.
8    A.  Yes, sir, it is.
9              (Plaintiff's Exhibit 1 marked for
10             identification.)
11   Q.  Is this the only documentation that was ever
12       prepared or has ever been maintained regarding
13       the incident made the subject of this case?
14       The reason I'm asking that is a lot of times
15       when there's an -- well, all the time when
16       there's an actual arrest, there's also an
17       affidavit and warrant and complaint and arrest
18       report, right, that would go along with this?
19   A.  There may be a statement that I had to write
20       in regards to the incident.
21   Q.  Do you know whether or not we've been provided
22       any statement with regard to the incident?  I
23       don't remember if the thing is in the file.

Deposition of Officer Curt Campbell                                                      March 3, 2006

Page 25

1    (Brief off-the-record discussion.)
2    MR. DUKES:  If there's one to be
3      found, I'll get it to you.
4    THE WITNESS:  It may be inside the
5      personnel --
6    MR. LEWIS:  Based on that
7      representation, we'll go ahead
8      with what's in the IO report.
9  Q.  I'm going to ask you to read what's on the
10     second page to yourself, and then I'm going to
11     ask you some questions about that, if you
12     will.
13  A.  (Witness complies.)
14  Q.  As a preliminary matter, did you sign the
15     bottom of that?  Is that your signature?
16  A.  Yes, sir.
17  Q.  And is that your handwriting throughout?
18  A.  That's my --
19  Q.  You didn't dictate that to individuals?
20  A.  No, sir, I did not.
21  Q.  This particular document has what's called a
22     narrative section which you say you wrote.
23     And what I was going to ask you about with

Page 26

1      regard to any other statements you might have
2      written, would this narrative have contained
3      all of the information you would have put in
4      any other statement that you might have
5      written or do you know?
6  A.  Could you repeat that question, sir?
7  Q.  Yes.  Is there anything in any other statement
8      that you've written that would be more than or
9      expand on what you have in this narrative?
10  A.  Yes, sir.
11  Q.  In what respects would that be true?
12  A.  The statement would be a detailed statement of
13     everything that occurred.
14  Q.  And the narrative would in essence be kind of
15     a short-hand rendition suitable, say, to
16     provide the elements for probable cause or
17     reasonable suspicion, right?
18  A.  Yes, sir.
19  Q.  Is that the purpose of that?  That's the
20     purpose of that?
21  A.  Yes, sir.
22  Q.  Now, you heard Young Master Searight talk
23     about what happened that afternoon of May 15,

Page 27

1      2005, and he indicated that I believe he stuck
2      up a bird or shot the bird or gave the finger
3      to his aunt across the street from where he
4      was standing and that you observed that,
5      turned around, came back, and that's when the
6      encounter occurred.  Do you remember that
7      testimony?
8  A.  Yes, sir, I do.
9  Q.  Now, in your words, what happened that evening
10     on North Pollard Street starting around 7:50
11     in the evening?
12  A.  The incident itself took place at around 7:20,
13     7:25 -- somewhere between 7:20 and 7:30 that
14     evening.
15  Q.  Let me stop you there and ask you whether or
16     not the City of Fort Deposit maintains logs of
17     radio transmissions.
18  A.  No, we don't.
19  Q.  Do you maintain tapes of radio transmissions?
20  A.  The City of Fort Deposit doesn't.
21  Q.  Now, I thought that was true.  Does the City
22     of Fort Deposit share a common communications
23     facility with any other enforcement agency?

Page 28

1  A.  Yes.
2  Q.  What is that agency or what are those
3      agencies?
4  A.  That would be the Lowndes County E-911 board.
5  Q.  Do any other law enforcement agencies share in
6      that common communication center?
7  A.  Yes, sir.
8  Q.  And which other ones do?
9  A.  Hayneville Police Department, Mosses Police
10     Department, White Hall Police Department,
11     Lowndes County Sheriff's Department.
12  Q.  So pretty much every law enforcement agency in
13     Lowndes County participates in the Lowndes
14     County E-911 board?
15  A.  Yes, sir.
16  Q.  To the best of your knowledge, does the
17     Lowndes County E-911 board maintain radio logs
18     of transmissions?
19  A.  Yes, sir.
20  Q.  Does it maintain audiotapes of radio
21     transmissions?
22  A.  I'm not aware that they do.
23  Q.  With regard to your estimate that the incident

7 (Pages 25 to 28)

Haislip, Ragan, Green, Starkie & Watson, P.C.
(334) 263-4455

Deposition of Officer Curt Campbell

March 3, 2006

Page 29

1  started between 7:20 and 7:30, to what are you
2  referring to to be able to say that it was
3  7:20 to 7:30?  Is it strictly from your
4  narrative or do you have some independent
5  recollection?
6  A.  My independent recollection as well as it's a
7  time of occurrence on the front side of the
8  report.
9  Q.  And when we're talking about time of
10  occurrence, you're looking at this section
11  which is in the event section that says time,
12  7:25 and time, 7:30, correct?
13  A.  That's correct.
14  Q.  So it started sometime between 7:20 and 7:30.
15  Tell me what happened.
16  A.  While on patrol I traveled north on Pollard
17  Street, and I noticed an individual standing
18  near a table or around a table, and I noticed
19  him make an obscene gesture.
20  Q.  I'm going to ask you to do something that
21  Mr. Searight declined to do earlier protesting
22  lack of talent in that regard.  I want you to
23  draw me a picture of the scene, if you will,

Page 30

1  as you were patrolling on North Pollard, what
2  you saw, where everything was in relationship
3  to the road.  And if you could, kind of label
4  it so we can know what we're talking about.
5  A.  (Witness complies.)
6  Q.  Well, it's not the Sistine Chapel, but it's
7  not bad.
8  North Pollard Street -- Would you indicate
9  which way is north?
10  A.  (Witness complies.)
11  Q.  You've got a couple of blocks there.  One is
12  marked Masonic Lodge, and that would be on the
13  east side of North Pollard Street?
14  A.  That's correct.
15  Q.  And then you come to a street that intersects
16  diagonally that you've labeled as Walker Mason
17  Street, correct?
18  A.  That's correct.
19  Q.  These other two rectangular indications, would
20  those be mobile homes?
21  A.  That's correct.
22  Q.  You've got a circle out almost intersecting
23  Walker and Mason Street.  Is that where the

Page 31

1  table is?
2  A.  That's correct.
3  Q.  How about putting a little mark there.  Mark
4  it "T" for table inside.  That's fine.
5  A.  (Witness complies.)
6  Q.  Were you aware at the time of the ownership of
7  these two mobile homes that you've marked?
8  A.  No.
9  Q.  You've indicated --
10  MR. LEWIS:  Let's just mark this as
11  Plaintiff's Exhibit 2.
12  (Plaintiff's Exhibit 2 marked for
13  identification.)
14  Q.  What you've marked with a "T" inside a circle
15  is the table to which you referred earlier
16  when you said an individual standing near a
17  table?
18  A.  That's correct.
19  Q.  How far is that table from Walker Mason
20  Street, the roadway itself?
21  A.  Maybe 5, 10 feet at tops.
22  Q.  So it's very near the road?
23  A.  That's correct.

Page 32

1  Q.  Is North Pollard a paved road?
2  A.  Yes, it is.
3  Q.  How about Walker Mason Street?
4  A.  No, it's not.
5  Q.  That's a gravel road or dirt or --
6  A.  Dirt, yes, sir.
7  Q.  So you were proceeding north on North Pollard
8  Street?
9  A.  Yes.
10  Q.  And how far would this table be from North
11  Pollard Street?  Do you have any idea?
12  A.  Maybe 20, 30 yards at best.
13  Q.  Twenty or thirty yards.  So we're talking
14  about 60 to 90 feet?
15  A.  Yes.
16  Q.  Where were you -- Where was your car, if
17  you'll indicate that, on North Pollard Street
18  when you noticed the individual standing next
19  to the table?
20  A.  Maybe somewhere around this area right here at
21  the intersection there.
22  Q.  How about marking that with an X inside so
23  we'll know where you were when you first saw

8 (Pages 29 to 32)

Deposition of Officer Curt Campbell

March 3, 2006

Page 33

1    the individual.
2  A.  (Witness complies.)
3  Q.  So you are -- when you see the individual
4    exhibiting what you called an obscene gesture,
5    you were at least 60 to 90 feet away from
6    them?
7  A.  Yes, sir.
8  Q.  And which direction was he facing when he was
9    exhibiting the obscene gesture?
10  A.  He was facing west, facing me.
11  Q.  Facing you. He was not facing across Walker
12    Mason Street?
13  A.  He was facing directly at Pollard Street.
14  Q.  Could you tell from 60 to 90 feet away whether
15    or not he was directing that gesture toward
16    you?
17  A.  No, I couldn't.
18  Q.  All you knew at that time was he was making an
19    obscene gesture?
20  A.  Yes.
21  Q.  And you're absolutely sure it was the middle
22    finger and not any other finger that was up
23    raised?

Page 34

1  A.  It was both hands.
2  Q.  He was using both hands?
3  A.  Yes.
4  Q.  One finger on each hand?
5  A.  Yes.
6  Q.  What action did you take upon observing this
7    individual giving you not one but two birds?
8  A.  I immediately proceeded down north --
9    traveling north on North Pollard. I came to
10    Lawhorn Street, which is not very far down,
11    maybe a hundred yards.
12  Q.  How about marking Lawhorn Street, if you
13    would.
14  A.  (Witness complies.)
15  Q.  So you got down to Lawhorn Street. What did
16    you do when you got there?
17  A.  I turned around.
18  Q.  And proceeded south on North Pollard?
19  A.  That's correct.
20  Q.  Tell me what happened from that.
21  A.  After I turned around on North Pollard
22    Street -- I mean, I turned around on Lawhorn
23    Street and headed south. I went back to

Page 35

1    Walker Mason Road where the individuals were
2    playing cards and where I noticed the
3    individual making the obscene gesture.
4  Q.  Stop right there, if you will.
5    At the time you were in the location
6    marked by an X in the box, you noticed the
7    individual making the obscene gesture. What
8    else, if anything, did you notice going on
9    around that table?
10  A.  Noticed individuals playing cards.
11  Q.  Males? Females? What?
12  A.  One male -- One adult male, two adult females
13    and two juvenile females.
14  Q.  All at the card table?
15  A.  That's correct.
16  Q.  And you observed that at the time you passed
17    Walker Mason Road heading north?
18  A.  That's correct.
19  Q.  Now, you turned around and went back and got
20    back to Walker Mason Road. What did you do
21    then?
22  A.  I turned in on Walker Mason Road, and I
23    proceeded to where the individuals were

Page 36

1    playing cards. And I noticed the individual
2    making the obscene gesture.
3  Q.  Would you mark where you parked your car on or
4    near Walker Mason Road and mark that maybe
5    with a 2 in the middle of it or something,
6    something to distinguish it?
7  A.  (Witness complies.)
8  Q.  So you pulled a little past the place where
9    the people were playing cards?
10  A.  Yes, sir.
11  Q.  What did you do at that point? First of all,
12    what did you see at that point, at the time
13    you turned around and came back and parked on
14    Walker Mason Road?
15  A.  Noticed the same individuals seated at the
16    table, and Mr. John Searight, Jr. standing up
17    at the table.
18  Q.  Was everybody else seated?
19  A.  Yes.
20  Q.  How long do you think it took you to get to
21    Lawhorn Street, turn around and come back and
22    park on Walker Mason Road?
23  A.  One to two minutes.

9 (Pages 33 to 36)

Deposition of Officer Curt Campbell                                    March 3, 2006

Page 37

1   Q.  When you came back and you parked, did you
2       park in the roadway or did you park -- pull
3       off to the side?  What did you do?
4   A.  I parked on the roadway.
5   Q.  You're parked on the roadway now.  The
6       individuals are still around the card table,
7       and Mr. Searight is standing up near there.
8   A.  Yes.
9   Q.  What did you do then?
10  A.  I exited the vehicle and I approached the
11      table, and I spoke to everyone that was there.
12  Q.  What did you say to everyone who was there?
13  A.  I said hi, how are y'all doing.
14  Q.  Was anybody breaking any laws as far as you
15      knew at that time, excluding Mr. Searight?
16  A.  Not that I could see.
17  Q.  All sorts of things might have been going on,
18      but you didn't see anything?
19  A.  That's correct.
20  Q.  So did they greet you?  Did they say hi,
21      Officer Campbell, or hey, Curt or anything
22      like that?
23  A.  Yes.

Page 38

1   Q.  Did you know any of those individuals at the
2       table?
3   A.  Knew every one of them.
4   Q.  Did any one of them speak to you?
5   A.  Yes.
6   Q.  Tell me who talked to you.
7   A.  Ms. Laura Walker, Mr. Travis Searight and
8       the -- and Melissa Walker as well as the two
9       juveniles.
10  Q.  Were they cordial to you?
11  A.  Yes.
12  Q.  So everybody else other than Mr. -- We're not
13      talking about Mr. Searight yet.  Everybody
14      else you got along with and you exchanged
15      greetings and nothing out of the ordinary
16      happened there?
17  A.  That's correct.
18  Q.  What did you do then?
19  A.  I then focused my attention to Mr. Searight.
20  Q.  Was Mr. Searight still engaged in the
21      gesticulation that you observed earlier?
22  A.  He was just standing up there.
23  Q.  Wasn't doing anything at that time?

Page 39

1   A.  No, sir.
2   Q.  You turned your attention to him.  He was just
3       standing there.  What did you do?
4   A.  I asked Mr. Searight why did he do what he
5       did.
6   Q.  What did he respond?
7   A.  He said, I wasn't doing nothing.  He said, I
8       just did this right here, holding up his right
9       index finger.  And then I explained to him
10      that that's not what I noticed and that was
11      very disrespectful.
12  Q.  And what did he respond?
13  A.  He said, so; I don't care; you ain't my damn
14      daddy.
15  Q.  Was that as far as you know a true statement?
16  A.  Yes.
17  Q.  What happened next?
18  A.  At that point I instructed him to not use that
19      language anymore, and he then replied, fuck
20      you; you ain't my daddy.  Mr. Travis Searight
21      said, Candy Man, you just a bad ass; if you
22      was my child, I would beat you.  I instructed
23      Mr. Searight or Mr. Crenshaw to come on and I

Page 40

1       was going to take him to his parents.
2   Q.  And everybody in this whole neighborhood is
3       named Searight, so I want to make sure that
4       we're talking about the John Searight, Jr. who
5       is sitting here and is the plaintiff in this
6       case.
7   A.  Yes.
8   Q.  That's the one you were talking to as opposed
9       to Travis Searight?
10  A.  Yes.
11  Q.  You told him -- Tell me again what you told
12      him.
13  A.  I explained to him that it was very
14      disrespectful for him to shoot the bird at
15      anybody, and that if it were some other adult,
16      they make take it the wrong way and try to
17      hurt him.
18  Q.  But you said something about taking him to his
19      parents?
20  A.  Yes.  I instructed Candy Man --
21  Q.  Yeah.  We'll call him Candy Man.  That's
22      fine.
23  A.  I instructed Candy Man to come on, I was going

10 (Pages 37 to 40)

Deposition of Officer Curt Campbell                                                              March 3, 2006

Page 41

1       to take him to his parents.
2    Q.   Did he come with you?
3    A.   No, he didn't.
4    Q.   What did he do?
5    A.   He said, you better not put your damn hands on
6        me, at which point I said, come on, let's go;
7        I'm going to take you to your parents and let
8        them deal with you. He said, you're not going
9        to do anything to me. Those were his exact
10       words: You're not going to do anything to me,
11       and you better not put your hands on me.
12   Q.   What happened then?
13   A.   I approached Candy Man, and I attempted to
14       grab his arm -- his left arm with my right
15       hand.
16   Q.   You were -- So you were grabbing his left arm
17       with the arm that was closest to the left arm,
18       which was your right arm?
19   A.   Yes, sir.
20   Q.   And what were you going to do after you
21       grabbed him?
22   A.   I was going to take Mr. -- I was going to take
23       Candy Man to my patrol car and transport him

Page 42

1       to his parents.
2    Q.   What happened when you grabbed his arm?
3    A.   He snatched away.
4    Q.   What happened then?
5    A.   And I grabbed his left arm again.
6    Q.   What did he do when you grabbed his arm?
7    A.   He proceeded to swing at me.
8    Q.   Did he hit you?
9    A.   Yes, he did.
10   Q.   Where did he hit you?
11   A.   On my -- On the left side of my face, my chin.
12   Q.   What proceeded from there?
13   A.   I grabbed his right arm with my right arm.
14   Q.   Okay. Let's see. You tried to grab his left
15       arm with your right arm and he snatched away,
16       and then you grabbed his arm again. Was that
17       his left arm with your right arm?
18   A.   Yes.
19   Q.   So at some point, did you release your right
20       hand from his left arm?
21   A.   Yes.
22   Q.   Is that when he hit you?
23   A.   Yes.

Page 43

1    Q.   So then you grabbed his right arm with your
2        right arm?
3    A.   Yes.
4    Q.   What did you do after you grabbed him?
5    A.   I held his right fist, and I twisted his arm
6        behind his back.
7    Q.   Twisted his right arm behind his back?
8    A.   Yes.
9    Q.   And then --
10   A.   He became very, very combative.
11   Q.   When you say combative, tell me what he did
12       that you construed as combative.
13   A.   The swing itself was combative, and he started
14       to try to get away from me, get aloose. So I
15       held his arm, and I grabbed him around his
16       shoulder and neck. And he continued to
17       struggle, kick, wiggle, and I held on to him.
18       And in an effort to get Candy Man under
19       control, I applied some pressure.
20   Q.   And you applied the pressure to a pressure
21       point?
22   A.   I just applied the pressure to --
23   Q.   His neck?

Page 44

1    A.   To his neck.
2    Q.   So at some point I assume he became more
3        docile and controllable?
4    A.   Yes, sir.
5    Q.   After sufficient pressure had been applied to
6        his neck?
7    A.   Not sufficient pressure. But after
8        instruction, after instruction, after
9        instruction.
10   Q.   Calmed down?
11   A.   Stop fighting, stop resisting, just sit down;
12       stop fighting, stop resisting, sit down.
13   Q.   Did you put him in handcuffs at any point?
14   A.   Yes, sir.
15   Q.   At what point did you put him in handcuffs?
16   A.   After I had gotten Candy Man in a full, seated
17       position on the ground.
18   Q.   So you didn't handcuff him until after he was
19       on the ground?
20   A.   That's correct.
21   Q.   He wasn't squatting? He was sitting on the
22       ground, correct?
23   A.   Correct.

11 (Pages 41 to 44)

March 3, 2006

Page 45

1  Q.  Did you say anything to him at that point?
2  A.  After the handcuffs were applied?
3  Q.  Right.
4  A.  Yes.
5  Q.  What did you say to him?
6  A.  I instructed him to get up.
7  Q.  Did he get up?
8  A.  Yes, he did.
9  Q.  And so after he got up, let's go to -- Let's
10      go to this diagram again.
11  A.  Yes.
12  Q.  With respect to this table and this mobile
13      home that you've marked here, where did this
14      struggle take place?
15  A.  It took place -- Actually, this mobile home
16      should be a little bit closer to the road
17      because they were kind of at the rear corner
18      of this mobile home in a driveway.
19  Q.  How about indicating the driveway, if you
20      would.
21  A.  Right here.
22  Q.  Did the driveway just came alongside the
23      mobile home?

Page 46

1  A.  Yes, sir, it did.
2  Q.  So basically the table was a little over this
3      way or the mobile home was a little over this
4      way?
5  A.  The mobile home was a little bit over this
6      way.
7  Q.  Toward North Pollard?
8  A.  Yes, sir.
9  Q.  So the confrontation took place primarily in
10      the driveway?
11  A.  Yes, sir.
12  Q.  Once you got him back on his feet, where did
13      you take him?
14  A.  I stood there for a moment, and instead of
15      taking him to his parents, I instructed one of
16      the juveniles around the table to go get his
17      parents.
18  Q.  Do you have a sense of how far his parents
19      lived away from where you had the
20      confrontation with him?
21  A.  Maybe a hundred, hundred and fifty yards tops.
22  Q.  Which juvenile did you instruct to get the
23      parents?

Page 47

1  A.  I just instructed -- just made -- yelled outa
2      command, and I don't know exactly which one
3      went and got his parents.
4  Q.  But you didn't move him at that point?
5  A.  No, sir, I didn't.
6  Q.  Did you ever take him over to near your patrol
7      vehicle?
8  A.  Eventually.
9  Q.  You had kind of issued a general instruction
10      for somebody to go get his parents?
11  A.  Yes, sir.
12  Q.  And one of the juveniles did run off and get
13      his parents?
14  A.  Somebody did.
15  Q.  While that person was gone and before the
16      parents arrived back at the scene, what
17      happened?
18  A.  Nothing. We just stood there.
19  Q.  When the parents arrived back -- First of all,
20      how long did it take for the parents to get
21      there?
22  A.  Maybe two to three minutes. No more than
23      five.

Page 48

1  Q.  So it was pretty quick?
2  A.  Yes, sir.
3  Q.  And you were still standing in the same place
4      when you arrived back there?
5  A.  In or near that same place.
6  Q.  Not to imply your feet were planted in the
7      ground, but you had not moved any great
8      distance?
9  A.  No, sir.
10  Q.  Did you have -- What's the first thing that
11      happened when the parents arrived?
12  A.  Well, Mr. John Arthur, Sr. was the first
13      person to arrive.
14  Q.  What, if anything, transpired when he arrived?
15  A.  Once he arrived, he asked me what was going
16      on; what was the problem. And as I was
17      attempting to explain to him, Ms. Lisa
18      arrived. She came up from near one -- behind
19      one of the other trailers that was there.
20  Q.  So tell me what you explained to Mr. Searight.
21  A.  I was attempting to explain to Mr. Searight
22      what had transpired between myself and his
23      son, and I was interrupted by Mrs. Searight.

12 (Pages 45 to 48)

March 3, 2006

Page 49

1    And my attention shifted totally for safety,
2    and I instructed Mr. Searight to take care of
3    her before she ends up in jail.
4    Q.   What was she doing that might end her up in
5    jail?
6    A.   She arrived at the scene cursing and directing
7    her comments to me.
8    Q.   What sort of comments was she directing to
9    you?
10   A.   I can't remember exactly what she said.
11   Q.   Do you remember the thrust of it?  What did
12   she want you to do?  What was the purpose of
13   her comments as far as you know or as far as
14   you could discern at the time?
15   A.   To let her son go.
16   Q.   So then you instructed Mr. Searight to take
17   control of Mrs. Searight before you had to
18   take her to jail too?
19   A.   Yes, sir.
20   Q.   What happened then?
21   A.   Mr. Searight immediately rushed to
22   Mrs. Searight, and he instructed her to go
23   over there; I'll take care of this.  Those

Page 50

1    were his exact words.
2    Q.   And you were all in favor of that?
3    A.   Yes, sir.
4    Q.   And I suppose you and Mr. Searight then had a
5    conversation?
6    A.   We proceeded.
7    Q.   Tell me how you proceeded.
8    A.   We proceeded to have a conversation as to why
9    I had handcuffed his child, at which point I
10   instructed Mrs. Laura Walker to explain to
11   Mr. Searight what happened.
12   Q.   Why did you do that?
13   A.   Because the general perception is that once
14   you grab a child or use any type of restraint
15   with a child, the general conception would be
16   that they are more likely to believe what
17   their child says than an actual police officer
18   or another individual.
19   Q.   So you asked Laura Wright -- Laura Walker --
20        (Brief off-the-record discussion.)
21   Q.   You asked Laura Walker to explain to
22   Mr. Searight what had transpired, correct?
23   A.   Yes, sir.

Page 51

1    Q.   Did she?
2    A.   Yes, sir, she did.
3    Q.   What did she tell Mr. Searight?
4    A.   That they were playing cards, Candy Man shot
5    him a bird, and I came over to talk to him.
6    And he started to cuss me and tried to fight
7    me.
8    Q.   And what did Mr. Searight do with this
9    information?
10   A.   He said, okay; I'll take care of him when I
11   get home; just take him out of the handcuffs.
12   Q.   Was that the first time he had asked you to
13   take him out of the handcuffs?
14   A.   No, sir.
15   Q.   When was the first time he had asked you to
16   take him out of the handcuffs?
17   A.   When he first arrived.
18   Q.   And that's when you proceeded to explain to
19   him and then asked Laura Walker to explain to
20   him what had happened?
21   A.   After Mrs. Searight interfered.
22   Q.   So at that point did you take him out of the
23   handcuffs?

Page 52

1    A.   No, I didn't.
2    Q.   What did you do then?
3    A.   I attempted to explain -- I explained to
4    Mr. Searight that I would take him out of the
5    handcuffs on one condition.
6    Q.   That condition ...
7    A.   Was that he not try to fight me again.
8    Q.   Did you impose any other conditions?
9    A.   Not that I can recall.
10   Q.   Did you suggest that he apologize or anything
11   else?
12   A.   No, sir, I didn't.
13   Q.   Did you get Candy Man to agree not to fight
14   you again?
15   A.   No, I did not.
16   Q.   So at what point did you release him from the
17   handcuffs?
18   A.   After his father approached -- came a little
19   bit closer to where we were.  At this point we
20   were at the car.
21   Q.   Why were you heading toward the car?
22   A.   To get away from the crowd.
23   Q.   Was the crowd hostile or aggressive or

13 (Pages 49 to 52)

Deposition of Officer Curt Campbell                                                      March 3, 2006

Page 53

1       threatening in any way?
2   A.  No.
3   Q.  You just wanted some privacy to be able to
4       deal with the situation?
5   A.  Yes, sir.
6   Q.  So you're down by the car, which is marked as
7       number 2 on Plaintiff's Exhibit Number 2. And
8       Mr. Searight has already told you he's going
9       to take care of Candy Man when he got him
10      home?
11  A.  Yes, sir.
12  Q.  At some point you became satisfied that, in
13      fact, there was no more threat?
14  A.  Yes, sir.
15  Q.  Is that when you released Candy Man?
16  A.  Yes, sir.
17  Q.  Anything else happen in that transaction from
18      the time Mr. Searight comes up until the time
19      you're down at the car releasing Candy Man?
20  A.  Yes, sir, it did.
21  Q.  Tell me what happened.
22  A.  When I attempted to take the handcuffs off of
23      Candy Man, he had his fist balled up and his

Page 54

1       father was talking to him. And he said, I'm
2       going to kill him; I'm going to kill him.
3       Mr. Searight then smacked Candy Man on the
4       head or on the back twice.
5   Q.  Did that cause a change in attitude of Candy
6       Man?
7   A.  Yes, sir, it did.
8   Q.  And at that point did he unball his fist and
9       quit telling you he was going to kill you?
10  A.  Yes, sir, he did.
11  Q.  Now, when he says to you -- this
12      fourteen-year-old kid, when he says to you
13      that he's going to kill you, did you take that
14      as a serious threat?
15  A.  Yes, I did.
16  Q.  But at some point you became satisfied that he
17      wasn't going to kill you, and you released
18      him?
19  A.  Yes, sir, I did.
20  Q.  Anything else that you haven't told me about
21      that transaction that you consider important
22      or substantial in explaining your actions or
23      anybody else's actions?

Page 55

1   A.  Not to my knowledge, sir.
2   Q.  And you released Candy Man, and you did what
3       then?
4   A.  After I released Candy Man, he immediately ran
5       to Ms. Alecia Crenshaw or Searight maybe 15
6       yards or so from where we were. And he
7       continued to say that he was going to get me,
8       and Ms. Crenshaw had to restrain him.
9   Q.  But he had run away from you toward her,
10      correct?
11  A.  Yes.
12  Q.  And she was restraining him from doing what as
13      far as you could tell?
14  A.  She was just physically holding him, and she
15      had actually moved from one side to the other.
16  Q.  Of the mobile home?
17  A.  Yes, sir. She initially started out over here
18      near this trailer, and he ran to her right
19      next to this trailer.
20  Q.  Well, let's mark this one with an "A" in the
21      middle of it so we know what we're talking
22      about and the other one "B".
23         So she's originally standing next to B

Page 56

1       mobile home?
2   A.  When she entered the scene, she came from
3       around this trailer.
4   Q.  From the north side of B trailer?
5   A.  Correct.
6   Q.  Down the side?
7   A.  Correct.
8   Q.  To the area closer to Walker Mason Road?
9   A.  That's correct.
10  Q.  So she's standing somewhere along the south
11      side of trailer B?
12  A.  Yes, sir.
13  Q.  And how close does she get to the table in
14      front of mobile home A? You've already told
15      Mr. Crenshaw to deal with her.
16  A.  Yes, sir.
17  Q.  I mean Mr. Searight. And so he's dealt with
18      her, and she's pretty much backed away from
19      the scene, correct?
20  A.  Yes, sir.
21  Q.  So by the time you released Mr. Searight, Jr,
22      Ms. Crenshaw or Ms. Searight is 15 or 20 yards
23      away?

14 (Pages 53 to 56)

Deposition of Officer Curt Campbell                                            March 3, 2006

Page 57

1   A.   That's correct. Fifteen to twenty feet.
2   Q.   Okay. And he runs toward her, and she's
3        restraining him. Can you tell from the body
4        language, the positioning, which direction he
5        wants to go from where she's restraining him
6        from going?
7   A.   Yes, sir.
8   Q.   Which way did he want to go?
9   A.   Back towards me and my vehicle and his father.
10  Q.   Did you get any sense of why if he had run
11       away to begin with he wanted to come back?
12  A.   Well, I guess he felt -- found a safe haven
13       with his mother.
14  Q.   So, anyway, she's restraining him. Whatever
15       is happening, she's got him?
16  A.   Yes, sir.
17  Q.   And he never comes back to you?
18  A.   No, sir, he didn't.
19  Q.   What do you do at that point?
20  A.   I proceeded to talk with Mr. Searight.
21  Q.   What did you talk about?
22  A.   Just that I was going to write a report about
23       the incident and that as far as I was

Page 58

1        concerned, it was over.
2   Q.   And did Mr. Searight say anything threatening
3        to you or rude or ugly?
4   A.   No, he didn't.
5   Q.   And so at that point after you had that
6        conversation with Mr. Searight, did you then
7        get into your car?
8   A.   Yes.
9   Q.   Anything happen before that that we haven't
10       talked about?
11  A.   Yes.
12  Q.   What was that?
13  A.   Another officer arrived.
14  Q.   What officer was that?
15  A.   Officer Jamie Davis.
16  Q.   And when did Officer Davis arrive? At what
17       point in all of this that we've been talking
18       about did Officer Davis arrive?
19  A.   During the time that it was being explained to
20       Mr. Searight what happened with his child.
21  Q.   And that was after you had released Candy Man?
22  A.   Yes, sir.
23  Q.   So Mr. Davis -- Officer Davis never saw Candy

Page 59

1        Man in your immediate vicinity?
2   A.   Not that I can recall.
3   Q.   He was already over with his mother by the
4        time Officer Davis arrived?
5   A.   To my knowledge, he was.
6   Q.   Because when we talk to Officer Davis, I want
7        to be sure I know at what point you think he
8        got there.
9   A.   If you talk to Officer Davis.
10  Q.   Sure. Where is Officer Davis?
11  A.   He is, one, no longer with the department and,
12       two, he's getting prepared to go to Iraq or
13       Afghanistan.
14  Q.   I will promise you this. I'm not going to
15       Iraq to depose him.
16            MR. DUKES: Oh, come on.
17  Q.   So Officer Davis, as far as you know, arrived
18       during the conversation with Mr. -- as far as
19       you remember, during the conversation with
20       Mr. Searight?
21  A.   Yes, sir.
22  Q.   What did Officer Davis say, if anything?
23  A.   He just followed my instructions.

Page 60

1   Q.   What were your instructions to Officer Davis?
2   A.   Just to keep the crowd back.
3   Q.   And the crowd at that point -- You've not
4        indicated that they were showing any
5        inclination to come closer to you; is that
6        correct?
7   A.   No, sir, they weren't.
8   Q.   You just wanted to make sure it stayed that
9        way?
10  A.   Yes, sir.
11  Q.   Put a little block, if you will, where Officer
12       Davis was parked and, if you will, mark that
13       number 3.
14  A.   (Witness complies.)
15  Q.   So Officer Davis kind of stayed back near
16       North Pollard Street from where you guys were
17       or his car was?
18  A.   His car was.
19  Q.   And then he walked over to where you were?
20  A.   He walked over near the area.
21  Q.   Anything else went on during that period of
22       time?
23  A.   No, sir.

15 (Pages 57 to 60)

Deposition of Officer Curt Campbell

March 3, 2006

Page 61

1  Q.  What did you do then?
2  A.  I was standing at the rear of my car when
3      Mr. Searight was proceeding to talk to me a
4      little bit, and I was actually writing down
5      some things on my I & O report right there on
6      the scene.
7  Q.  This I & O report that we are going to mark as
8      Plaintiff's Exhibit Number 1, did you start
9      filling this particular sheet of paper out on
10     the scene?
11 A.  Yes, sir, I did.
12 Q.  And I would assume -- let me see if I'm
13     right -- that one of the things you probably
14     would have put down there would have been the
15     street address and the names of some of the
16     witnesses, correct?
17 A.  Yes, sir.
18 Q.  So that you would have those handy when you
19     got back?  I mean, rather than writing them in
20     a notebook or something like that, you just
21     went ahead and wrote them on the I & O?
22 A.  I wrote down Mr. Searight's street address.
23     As far as the street address of where the

Page 62

1      incident occurred, the numerical address,
2      there aren't any numbers to indicate exactly
3      where things are on the street.
4  Q.  You've got down here on this I & O report
5      Laura Walker, Travis Searight, Melissa Walker,
6      and those are the only three witnesses you've
7      got listed.
8      Any reason why you didn't put other
9      witnesses who might have been there down?
10 A.  I didn't know the name of the juveniles, not
11     the entire names of them.  I just know them --
12     I know the young ladies when I see them in the
13     neighborhood.
14 Q.  And these were the only adults who were there
15     at the time?
16 A.  Yes, sir.
17 Q.  Laura, Travis and Melissa?
18 A.  Yes, sir.
19 Q.  So you put down all of the adults who were
20     present?
21 A.  Yes, sir.
22 Q.  And then, of course, you've got John and Lisa
23     Searight down here.

Page 63

1      So you're taking down information.  Is
2      there anything happening while you're doing
3      that?
4  A.  While I'm writing the I & O report, Ms. Willie
5      Nell Searight approaches from between the
6      trailers and asks why was her 13-year-old
7      nephew placed in handcuffs.
8  Q.  And she's asking you that?
9  A.  Yes, sir.
10 Q.  And what do you tell her?
11 A.  I instructed her that it was a police matter
12     and that I spoke with the father in reference
13     to that matter.
14 Q.  Did she do anything or say anything else?
15 A.  She was just ad libbing as to I don't see why
16     you put a 13-year-old child in handcuffs.
17 Q.  She was just offering commentary, right?
18 A.  She was just basically mouthing off.
19 Q.  Mouthing off, I was actually going to use that
20     word.
21     So she was mouthing off to you, and you
22     basically explained to her it's a police
23     matter and you were already dealing with the

Page 64

1      father?
2  A.  Yes, sir.
3  Q.  Did she do or say anything else other than
4      just mouthing off?
5  A.  Just continued to mouth off, and I continued
6      to write.
7  Q.  When you finished writing -- Did anybody else
8      do anything while you were writing on the
9      I & O report?
10 A.  No.  The crowd just began to disperse.
11 Q.  And at some point I assume you completed your
12     job and got in your car and left?
13 A.  Yes, sir.
14 Q.  And Officer Davis left at the same time you
15     did?
16 A.  Yes, sir.
17 Q.  Anything else about that incident at all that
18     you consider to be important that I haven't
19     asked you about that's relevant to any charges
20     or defenses in this case?
21     MR. DUKES:  Object to the form.
22     MR. LEWIS:  Sure.
23 Q.  You can go ahead and answer.

16 (Pages 61 to 64)

Deposition of Officer Curt Campbell                                    March 3, 2006

Page 65

1   A.  After the incident was over and we had left
2       the scene, approximately 20 to 30 minutes
3       later, if I am correct, I received a call from
4       the Lowndes County 911.
5   Q.  What did they say?
6   A.  They asked for any Fort Deposit unit that's
7       10-8.
8   Q.  That means in service?
9   A.  That means available for service. And I
10      answered.
11  Q.  And what was the substance of that call?
12  A.  They asked that I respond to North Pollard
13      Street, 311 or 315 or something thereof, in
14      reference to a child being choked by an
15      officer.
16  Q.  Excuse me. They were asking you to respond to
17      the same incident in which you had been
18      involved?
19  A.  That's correct.
20  Q.  And what did you do?
21  A.  I then acknowledged that I would get someone
22      over there to stand by for the ambulance for
23      which they needed someone to show the

Page 66

1       ambulance where they were going.
2   Q.  And who as far as you know did that?
3   A.  I instructed Officer Davis to respond to that
4       area because the incident involved me, and I
5       didn't want to escalate the matter anymore.
6   Q.  So as far as you know, Officer Davis did
7       respond and everything else took place like it
8       normally would on an ambulance run?
9   A.  Yes, sir.
10  Q.  You don't know of anything unusual beyond
11      that?
12  A.  No, sir, I don't.
13  Q.  How would Officer Davis have known to show up
14      on Walker Mason Street at the time he did?
15  A.  I called him by radio.
16  Q.  Him specifically?
17  A.  Yes, sir. He was the only other officer on
18      duty.
19  Q.  When did you call him by radio? What point?
20  A.  After I had gotten Mr. Searight in custody.
21  Q.  Did you go to your car to do that or did you
22      do it with a portable radio?
23  A.  I did it with my hand-held.

Page 67

1   Q.  So after you had handcuffed Candy Man, that's
2       when you called Officer Davis?
3   A.  Yes, sir.
4   Q.  Anything else that you know of about that day
5       that stands out?
6   A.  Yes, sir, I do.
7   Q.  What was that?
8   A.  I noticed that sometime that night after Candy
9       Man was taken to the hospital there were some
10      comments made inside the hospital in reference
11      to threats against me.
12  Q.  Who were those comments made by as far as you
13      know?
14  A.  Some of the family members.
15  Q.  Do you know which family members?
16  A.  No, sir, not exactly.
17  Q.  Who reported these comments to you?
18  A.  My sister or my mother. They were at the
19      hospital with my grandmother.
20  Q.  And when you're saying family members, you're
21      talking about Searight family members?
22  A.  Yes, sir.
23  Q.  Do you know who -- You don't know who made the

Page 68

1       comments that were reported to you? You're
2       not sure who did that?
3   A.  No, sir.
4   Q.  What was the nature of the comments?
5   A.  That they were going to do some type of bodily
6       harm to me or that they would like to do some
7       type of bodily harm to me.
8   Q.  Would it have been something like, you know,
9       we just ought to kick his butt, or was it
10      like, let's sneak up on him in the middle of
11      the night and rip his arms off? Could you
12      tell me from what you heard?
13  A.  My mother called and she asked me if I was
14      okay and that I better look out, and I think
15      that was -- I think it was my mother. It may
16      have been my sister. It was a pretty trying
17      time because my grandmother was terminally
18      ill.
19  Q.  Has your grandmother since passed away?
20  A.  Yeah.
21  Q.  I'm sorry to hear that.
22      Anything else related to this incident
23      that you can remember?

17 (Pages 65 to 68)

Haislip, Ragan, Green, Starkie & Watson, P.C.
(334) 263-4455

Deposition of Officer Curt Campbell

March 3, 2006

Page 69

1  A.  (Witness nods head negatively.)
2       MR. DUKES:  Why don't we take a
3       five-minute break.  We've been
4       going over an hour.
5       (Brief recess.)
6  Q.  (Continuing by Mr. Lewis) Back on the record
7       after a break.
8       I think I was asking you whether or not
9       there was anything else about that day and
10      that incident that you consider to be relevant
11      in any way to the claims and defenses in this
12      case that you have not told me about, and I
13      think you told me that that was all you could
14      remember; is that correct?
15      MR. DUKES:  Object to the form.
16 Q.  Or if there is something else, please tell me.
17 A.  I just told you about what I heard from the
18      hospital.
19 Q.  Right.  And anything else?
20 A.  Not that I can remember.
21 Q.  When you called Officer Davis and Officer
22      Davis arrived on the scene, would that
23      communication have gone through the E-911

Page 70

1       board?
2  A.  No, sir.
3  Q.  This would have been just officer-to-officer
4       communication?
5  A.  That would have been on our primary channel.
6  Q.  And that is not monitored or regulated in any
7       way by E-911?
8  A.  No, sir.
9  Q.  So there would be no record, if I understand
10      you correctly, of the call to Officer Davis or
11      his call on the scene, correct?
12 A.  No, sir.
13 Q.  Going back and filling in some details about
14      this, basically looking at your incident and
15      offense report which we have now copied and
16      made an exhibit as Plaintiff's Exhibit Number
17      1 -- I believe the way I have stapled it, the
18      second page is actually on top and the first
19      page is on the bottom.  But nevertheless it's
20      a two-page document, you've got disorderly
21      conduct/misdemeanor.  Explain to me what
22      you're talking about.

Page 71

1  A.  Disorderly conduct is when -- or my
2       interpretation is when you have a person who
3       refuses to comply with a lawful order in the
4       presence of three or more people or something
5       to that effect.
6  Q.  Where did you hear that?  Where did you learn
7       that?
8  A.  It should be within the Title 13 of the
9       Alabama Criminal Code.
10 Q.  My problem is that if there was any -- if
11      there was disorderly conduct the way you
12      describe it, that would have happened only
13      after you arrived on the scene and were
14      attempting to restrain or otherwise interact
15      with Mr. Searight, Jr; is that correct?
16 A.  Yes, sir.
17 Q.  Well, what was he doing of a criminal nature,
18      if anything, prior to the time you arrived on
19      the scene?
20 A.  Making the obscene gesture.
21 Q.  What crime was that?
22 A.  Flipping the bird.
23 Q.  Right.  Is there a crime called flipping the

Page 72

1       bird?
2  A.  No.  It's making an obscene gesture.  I'm not
3       sure -- That may fall under the disorderly
4       conduct act or so.
5  Q.  Well, if it doesn't fall under disorderly
6       conduct, what crime does it constitute, if you
7       know?
8  A.  To my knowledge, it would be making an obscene
9       gesture.
10 Q.  Is that a crime?
11 A.  I can't say exactly.
12 Q.  So if you can't say exactly today whether that
13      was a crime, could you say exactly back on May
14      5, 2004 whether or not that was a crime, or
15      did you know at that time?
16 A.  May 15, 2005?
17 Q.  Yeah, whatever date that was.  May 15, 2005.
18      Was it a crime on that date or did you think
19      it was a crime on that date?
20 A.  Yes, sir.
21 Q.  And, again, the crime would be what,
22      disorderly conduct?
23 A.  Yes, sir.

18 (Pages 69 to 72)

Deposition of Officer Curt Campbell                                                                    March 3, 2006

Page 73

1    Q.  And you're pretty sure that the birds were
2         directed to you?
3    A.  Yes, sir.  I interpreted it to be directed
4         at --
5    Q.  Or whoever was driving the police car?
6    A.  Yes, sir.
7    Q.  Whether it was you or not?
8    A.  Yes, sir.
9    Q.  You're pretty sure as you're sitting here
10        today that he was flipping the bird or birds,
11        multiple birds, at the police car or at the
12        person driving the police car?
13   A.  Yes, sir.
14   Q.  Were you ever instructed in any of your law
15        enforcement training that, in fact, flipping a
16        bird at a police officer is not a crime?
17   A.  No, I wasn't.
18   Q.  Were you ever instructed in any of your law
19        enforcement training that remarking to a
20        police officer, fuck you, is not a crime?
21   A.  No, I wasn't.
22   Q.  You're not a lawyer?
23   A.  No, I'm not.

Page 74

1    Q.  And you're not familiar with cases like Collin
2         versus California or anything like that?
3    A.  Not that particular one.
4    Q.  You had indicated that at the time you
5         attempted to restrain Candy Man that he
6         attempted to resist your attempts to restrain
7         him --
8    A.  Yes, sir.
9    Q.  -- just to kind of shorthand what you were
10        saying.
11            Was that a fair statement, that he
12        attempted to resist you?
13   A.  Yes, sir.
14   Q.  Is it your understanding that an attempt to
15        resist an arrest is always a crime?
16   A.  Yes.
17   Q.  So even if you had no probable cause to make
18        an actual arrest -- If, for example, you found
19        out that flipping a bird at a police officer
20        is simply not a crime, if you found that out,
21        it would still be wrong for him to resist your
22        attempts to restrain him?
23            MR. DUKES:  Object to the form.

Page 75

1    Q.  Go ahead.  You can answer the question.
2    A.  Rephrase that question, please.
3    Q.  Let's say that he was wearing a blue shirt and
4         you mistakenly thought that wearing a blue
5         shirt was a crime in Lowndes County, and you
6         were attempting to arrest him for wearing a
7         blue shirt when, in fact, that's not a crime.
8             Is it your understanding that if he
9         resisted your attempts to arrest him for
10        wearing a blue shirt, that would still
11        constitute a wrongful act on his part?
12            MR. DUKES:  Object to the form.
13   A.  Yes.
14   Q.  So, in other words, a person in Alabama is not
15        allowed to resist even an unlawful arrest?
16   A.  To my knowledge, they are not.
17   Q.  They are not allowed to do so.
18            And you also indicated that he was failing
19        or refusing to obey a lawful order of a police
20        officer, right?
21   A.  Yes.
22   Q.  Is that a crime?
23   A.  No, it's not.  It's not a criminal act.  It's

Page 76

1         under the motor vehicle code, Title 32,
2         failure to obey.
3    Q.  But that's when you're in the process of
4         directing traffic.
5    A.  Yes, sir.
6    Q.  But in other circumstances -- like, for
7         example, if you said to me, Lewis, I want you
8         to stand on your hand in the corner and I
9         refuse to obey, that wouldn't be a crime, my
10        refusal to obey that?
11   A.  No.
12   Q.  I'm just trying to get an understanding of
13        your understanding of the state of the law.
14            You said that you attempted to explain to
15        him that it was disrespectful to shoot birds
16        at police officers.  Does it give you cause to
17        arrest him that he wasn't paying any attention
18        to you or making those comments to you like
19        fuck you; you ain't my daddy?  Was that cause
20        to arrest him?
21   A.  I never arrested him.
22   Q.  And I don't want to get too technical here,
23        but is it your understanding that any

19 (Pages 73 to 76)

Page 77

1    restraint of a person's liberty under color of
2    official office is, in fact, an arrest?
3  A. No.
4  Q. That's not?  What constitutes an arrest?
5  A. Actual physical control over the individual.
6  Q. Isn't that what I said, restraint of liberty?
7    Would that be an arrest if you had put him in
8    handcuffs?
9  A. Or if I had instructed him that he was under
10   arrest.
11 Q. Until you -- So your position is that until
12   you tell him he's under arrest, he's not under
13   arrest?
14 A. Yes, sir.
15 Q. Even if you've got him handcuffed sitting on
16   the ground?
17 A. Yes, sir.
18 Q. Mr. Dukes asked Candy Man about his previous
19   contacts with you.  Do you remember those
20   questions?
21 A. Yes, sir, I do.
22 Q. And there was some indication that perhaps he
23   had not remembered each and every contact.  Do

Page 78

1    you have more contacts than he talked about?
2    I'd hate for you to go over each and every one
3    he mentioned.
4  A. Yes, sir, I do.
5  Q. Go ahead.
6  A. I've received several complaints about Candy
7    Man as well as other juveniles throwing rocks
8    at people or breaking windows out of buildings
9    and whatnot.
10 Q. When were these complaints?
11 A. I can't recall exactly.
12 Q. Did you ever make an arrest based on those
13   complaints?
14 A. No, sir, I didn't.
15 Q. And what was the reason why you didn't?
16 A. Some of which I never made contact with Candy
17   Man himself.  And on other occasions I made
18   contact with his father and advised him as to
19   what I was called for.
20 Q. These complainants, did they identify Candy
21   Man by name or street name?
22 A. Yes, sir.
23 Q. Now, who were these complainants?

Page 79

1  A. One was Benny Gates.
2  Q. And what did Mr. Gates complain about?
3  A. Mr. Gates alleged that Candy Man and several
4    other juveniles were throwing rocks at his
5    dogs as well as shooting at his dogs on
6    numerous occasions as they pass by his house.
7  Q. Shooting with what?
8  A. BB gun.
9  Q. Where does Mr. Gates live?
10 A. He lives on North Pollard Street as well.
11 Q. Did he ever come down and sign a complaint,
12   sign a warrant or anything like that?
13 A. Not with me.
14 Q. Do you know whether he did with anybody else?
15 A. No, sir, I don't know.
16 Q. Do you know how long ago this was?
17 A. Maybe within the last 18 months or so.
18 Q. How about -- What else?  Any other complaints?
19 A. Yes.  That Candy Man groped a female student
20   at the school.
21 Q. Who made that report?
22 A. The parent of the child.
23 Q. Do you remember the name?

Page 80

1  A. Yes.
2  Q. Who was that?
3  A. Stacy Taylor.
4  Q. Stacy Taylor was the parent?
5  A. Yes.
6  Q. And that was at Lowndes County Middle School?
7  A. Yes, sir.
8  Q. Do you know whether Stacy Taylor ever filed a
9    complaint or signed a warrant?
10 A. She filed a complaint.  She never got to sign
11   a warrant.
12 Q. Do you know why?
13 A. She had passed a 14-day period to pursue
14   charges against a juvenile.
15 Q. And you've only got -- And you're telling me
16   something I don't know.  You only have 14
17   days -- If you've made a complaint against a
18   juvenile, you've only got 14 days to sign a
19   warrant?
20 A. Yes, sir.  A petition.
21 Q. Right.
22   Anybody else?
23 A. Yes.  There was an incident which occurred at

Deposition of Officer Curt Campbell
March 3, 2006

Page 81

1    Calico Fort.
2    Q.  Who was the complainant?
3    A.  I don't distinctly remember the complainant.
4       I just remember the other juvenile with whom
5       Candy Man supposedly slapped.
6    Q.  Oh, Candy Man and a juvenile were involved in
7       an argument?
8    A.  I can't say it was an argument.  The complaint
9       that came to me was that Candy Man slapped
10      this little boy at Calico Fort.
11   Q.  And Calico Fort is some trade festival?
12   A.  Yes.  It's a large arts and craft ...
13   Q.  When was that?
14   A.  April 2004.
15   Q.  Anything else?
16   A.  That's it.  Several firecracker incidents
17      where -- I live in the Fort Deposit Housing
18      Authority, and Candy Man as well as other
19      juveniles have been over there shooting
20      firecrackers.  And instead of just picking
21      them up and taking them to their parents, I
22      just take the firecrackers and ask that they
23      don't shoot them anymore.

Page 82

1    Q.  Is there some prohibition against shooting
2       firecrackers in Fort Deposit?
3    A.  Not in Fort Deposit.  Just over in the Housing
4       Authority for which we live.
5    Q.  Who passed that rule?
6    A.  It's within the -- It's within the lease for
7       all tenants, and that we are not to allow
8       anyone to shoot firecrackers or any type of
9       fireworks or firearms on that property.
10   Q.  So as far as you know, that's just a provision
11      of the lease?
12   A.  Yes, sir.
13   Q.  It's not a crime?
14   A.  No.  It's just the rules of that apartment
15      complex.
16   Q.  Anything else other than what he's already
17      talked about?
18   A.  Yes.
19   Q.  Okay.  Tell me about that.
20   A.  Cursing of other individuals, both adult and
21      juvenile, within the city limits of Fort
22      Deposit.
23   Q.  And who made this report?

Page 83

1    A.  I don't exactly remember who the individuals
2       were, but on one or two occasions I've heard
3       him myself.
4    Q.  And what have you heard him say?
5    A.  Fuck you, kiss my ass, and a few other words.
6       Go to hell.
7    Q.  Anything that constitutes a crime?
8    A.  Just basically moral turpitude for me.
9    Q.  Just being a thug?  Is that what you're
10      saying?
11   A.  No, sir, I wouldn't say a thug.
12   Q.  Anything else?
13   A.  Not that I can think of at this time.
14   Q.  Let's see.  Complaints about him throwing
15      rocks, breaking windows.  Specific
16      complaints:  Benny Gates.  Did Benny Gates
17      ever sign a warrant or file a complaint?
18   A.  I'm not sure.  He didn't do it with me.
19   Q.  Did you ever contact Candy Man about Benny
20      Gates' complaints?
21   A.  No, I didn't.
22   Q.  So that was not a contact with him?
23   A.  No, it wasn't.

Page 84

1    Q.  And we already talked about Stacy Taylor, and
2       did you have any contact with Candy Man about
3       that?
4    A.  No, I did not.
5    Q.  No contact.
6           Now, the deal about Candy Man slapping a
7       little boy at Calico Fort in 2004, how little
8       was the little boy?  Do you know?
9    A.  He was about the same height as Candy Man, but
10      he was a lot bigger.
11   Q.  Candy Man was a lot bigger?
12   A.  No.  The little boy that he slapped was a
13      little -- fat little boy.  He was fat.
14   Q.  Chubby little person?
15   A.  Yes.
16   Q.  And so the little boy who got slapped was
17      actually bigger than Candy Man in terms of
18      weight?
19   A.  Yes.
20   Q.  And about the same height?
21   A.  Yeah.
22   Q.  Did you make contact with Candy Man about that
23      slapping incident?

21 (Pages 81 to 84)

Haislip, Ragan, Green, Starkie & Watson, P.C.
(334) 263-4455

Deposition of Officer Curt Campbell

March 3, 2006

Page 85

1  A.  Yes, I did.
2  Q.  What happened there?
3  A.  I tried to -- I tried to get him and take him
4     to his mother who was working at Calico Fort
5     at the time.
6  Q.  And what did he do?
7  A.  He ran.
8  Q.  As far as you know, did anybody ever file a
9     complaint, warrant, petition, anything on him
10    for that?
11 A.  No.
12 Q.  In 2004 Candy Man would have been, what,
13    eleven or twelve?
14 A.  Eleven or twelve.
15 Q.  And cursing other juveniles, both adult and --
16    cursing other individuals, both adult and
17    juveniles, you've heard him do that on
18    occasion?
19 A.  Yes.
20 Q.  Did you ever arrest him for that or sign a
21    petition or warrant or anything else?
22 A.  No, I didn't.
23 Q.  Did anybody else to the best of your

Page 86

1     knowledge?
2  A.  No, they didn't.
3  Q.  To the best of your knowledge, has anybody
4     ever signed a juvenile petition, pick-up
5     petition, delinquency petition, CHINS petition
6     on Candy Man?
7  A.  No, sir, not to my knowledge.
8  Q.  So as far as you know -- I understand that
9     juvenile records are sealed, but as far as you
10    know, there's no juvenile record out there on
11    Candy Man?
12 A.  As far as I know, no, there's not.
13 Q.  So as far as you know, what Candy Man does is
14    just get in a lot of trouble?
15 A.  Yes, sir.
16 Q.  Juvenile-type trouble?
17 A.  Yes, sir.
18 Q.  No reports of him robbing anything or cutting
19    anybody or anything like that?
20 A.  No, sir.
21 Q.  Now, based on this incident here involving May
22    15 of 2005, have you been subjected to any
23    investigation by the City of Fort Deposit or

Page 87

1     the police department of Fort Deposit or the
2     internal affairs section of the police
3     department of Fort Deposit or ABI regarding
4     this?
5  A.  No, not to my knowledge.
6  Q.  As far as you know, did the City of Fort
7     Deposit ever undertake an investigation of
8     this incident or your part in it?
9  A.  Not to my knowledge.
10        MR. LEWIS:  Can you give us about
11     five minutes?  I think we're just
12     about to wrap up here.
13        (Brief recess.)
14 Q.  (Continuing by Mr. Lewis) One thing I forgot
15    to mention to you in the beginning when I went
16    through my litany is you do have the right to
17    read and sign this deposition.  Most people
18    waive that right.  But you're represented so
19    your lawyer would be giving you all the advice
20    you need on whether to do it or not.  But the
21    court reporter needs to know whether or not
22    she needs to prepare a transcript for you to
23    read, review and sign.  What you can do is

Page 88

1     just review that for the accuracy of what she
2     took down.  It's not for changing what you
3     said or refreshing your recollection or
4     anything like that.
5        So the question is, do you want to read
6     and sign your deposition or do you want to
7     waive that right?  And you can ask Mark about
8     that.
9        MR. DUKES:  We'll read and sign.
10       MR. LEWIS:  That having been said,
11     that's all I have.
12       EXAMINATION
13 BY MR. DUKES:
14 Q.  Officer Campbell, let me just ask you a
15    question or two to clarify a few things.
16       When you first approached Candy Man, you
17    were going to take him by the hand and just
18    take him up the street to his parents' house;
19    is that correct?
20 A.  Yes, I was.
21 Q.  You didn't attempt to restrain him or put the
22    handcuffs on him until after he took a swing
23    at you and hit you in the face; is that

22 (Pages 85 to 88)

Deposition of Officer Curt Campbell                                                    March 3, 2006

---

Page 89

1    correct?
2            MR. LEWIS:  Object to the form.
3    A.  That's correct.
4    Q.  Let me just make sure I have this straight.  I
5        think at one point you said that making an
6        obscene gesture such as this, that it could
7        cause some trouble.  Was it your understanding
8        that it fell under the law for disorderly
9        conduct?
10   A.  Yes, sir.
11           MR. DUKES:  That's all the questions
12       I have.
13           MR. LEWIS:  Let me follow up on that
14       first one.
15           EXAMINATION
16   BY MR. LEWIS:
17   Q.  Regarding what you were going to do, you said
18       and -- I believe I wrote this down exactly as
19       you said it -- you attempted to grab his left
20       arm with your right arm, correct?
21   A.  That's correct.
22   Q.  And he snatched away, right?
23   A.  That's correct.

---

Page 90

1    Q.  And you attempted -- you grabbed his arm
2        again?
3    A.  Yes.
4    Q.  At that point your contention is that he swung
5        at you, correct?
6    A.  Yes, he swung at me.
7    Q.  After the second time you grabbed him?
8    A.  Yes, he swung at me.
9            MR. LEWIS:  That's it.
10           (Deposition concluded at
11           approximately 3:00 p.m.)
12
             * * * * * * * * * * * *
13
             FURTHER DEPONENT SAITH NOT
14
             * * * * * * * * * * * *
15
16           REPORTER'S CERTIFICATE
17   STATE OF ALABAMA:
18   MONTGOMERY COUNTY:
19       I, Pamela A. Wilbanks, Registered
20   Professional Reporter and Commissioner for the State
21   of Alabama at Large, do hereby certify that I
22   reported the deposition of:
23           OFFICER CURT CAMPBELL

---

Page 91

1    who was first duly sworn by me to speak the truth,
2    the whole truth and nothing but the truth, in the
3    matter of:
4            J.S., (a minor child by
5            and through his father and
6            next friend, JOHN SEAWRIGHT),
7            Plaintiff,
8            Vs.
9            OFFICER CURT CAMPBELL, in
10           his individual capacity,
11           Defendant.
12           In The U.S. District Court
13           For the Middle District of Alabama
14           Northern Division
15           02:05-CV-928-WKW
16   on Friday, March 3, 2006.
17       The foregoing 90 computer printed pages
18   contain a true and correct transcript of the
19   examination of said witness by counsel for the
20   parties set out herein.  The reading and signing of
21   same is hereby not waived.
22       I further certify that I am neither of kin
23   nor of counsel to the parties to said cause nor in

---

Page 92

1    any manner interested in the results thereof.
2        This 9th day of March, 2006.
3
4
5
6
7
8
9
             _____
10           Pamela A. Wilbanks, Registered
             Professional Reporter and
             Commissioner for the State
11           of Alabama at Large.
12
13
14
15
16
17
18
19
20
21
22
23

---

23 (Pages 89 to 92)

    I, Officer Curt Campbell, hereby certify that I have read the foregoing transcript of my deposition given on Friday, March 3, 2006, and it is a true and correct transcript of the testimony given by me at the time and place stated with the corrections, if any, and the reasons therefor noted on a separate sheet of paper and attached hereto.


_____
    Officer Curt Campbell


    SWORN TO AND SUBSCRIBED before me this _____ day of _____, 20___.


_____
    NOTARY PUBLIC


3/9/06
Officer Curt Campbell
741 Edgewood Drive
Fort Deposit, AL 36032

Dear Officer Campbell:

Enclosed is a copy of the transcript of your deposition taken on Friday, March 3, 2006. Please read the transcript and make any corrections on the correction sheet provided specifying the page and line number of each correction.

You will find the original signature page attached to the front of the transcript. Even if there are no corrections, please sign the original signature page and have your signature notarized.

Please return the signature page, correction sheet and transcript within thirty days. The list of corrections will be attached to the original deposition and all parties will be notified of any changes.

Thank you for your prompt attention to this matter.

Sincerely,

Pamela A. Wilbanks, RPR
cc: Mr. S. Mark Dukes
    Mr. Jay Lewis

24 (Pages 93 to 94)