# Exhibit 3
# Deposition of
# Alecia Searight

Page 1

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3        NORTHERN DIVISION
4
5  J.S., (a minor child by
   and through his father and
6  next friend, JOHN SEAWRIGHT),
7      Plaintiff,
8  Vs.              CIVIL ACTION NO.
                    02:05-CV-928-WKW
9  OFFICER CURT CAMPBELL, in
   his individual capacity,
10
       Defendant.
11
12        * * * * * * * * * * * *
13
14     DEPOSITION OF ALECIA SEARIGHT, taken pursuant
15  to stipulation and agreement before Pamela A.
16  Wilbanks, Registered Professional Reporter and
17  Commissioner for the State of Alabama at Large, in
18  the Richardson Legal Center, 133 Hayneville Plaza,
19  Hayneville, Alabama, on Friday, March 3, 2006,
20  commencing at approximately 4:00 p.m.
21
22        * * * * * * * * * * * *
23

Page 2

1
2              APPEARANCES
3
4  FOR THE PLAINTIFF:
5  Mr. Jay Lewis
   LAW OFFICES OF JAY LEWIS & ASSOCIATES
6  Attorneys at Law
   847 South McDonough Street
7  Suite 100
   Montgomery, Alabama
8
   FOR THE DEFENDANT:
9
   Mr. S. Mark Dukes
10 NIX, HOLTSFORD, GILLILAND, HIGGINS & HITSON
   Attorneys at Law
11 4001 Carmichael Road - Suite 300
   Montgomery, Alabama 36106
12
   ALSO PRESENT:
13
   Mr. Searight
14 Officer Curt Campbell
15
16
17        * * * * * * * * * * * *
18
          EXAMINATION INDEX
19
   BY MR. DUKES . . . . . . . . . . . 4
20 BY MR. LEWIS . . . . . . . . . . . 43
   BY MR. DUKES . . . . . . . . . . . 44
21
22        * * * * * * * * * * * *
23

Page 3

1             STIPULATION
2      It is hereby stipulated and agreed by and
3  between counsel representing the parties that the
4  deposition of ALECIA SEARIGHT is taken pursuant to
5  the Federal Rules of Civil Procedure and that said
6  deposition may be taken before Pamela A. Wilbanks,
7  Registered Professional Reporter and Commissioner for
8  the State of Alabama at Large, without the formality
9  of a commission, that objections to questions other
10 than objections as to the form of the question need
11 not be made at this time but may be reserved for a
12 ruling at such time as the said deposition may be
13 offered in evidence or used for any other purpose by
14 either party provided for by the Statute.
15     It is further stipulated and agreed by and
16 between counsel representing the parties in this case
17 that the filing of said deposition is hereby waived
18 and may be introduced at the trial of this case or
19 used in any other manner by either party hereto
20 provided for by the Statute regardless of the waiving
21 of the filing of the same.
22     It is further stipulated and agreed by and
23 between the parties hereto and the witness that the

Page 4

1  signature of the witness to this deposition is hereby
2  waived.
3
4        * * * * * * * * * * * *
5
           ALECIA SEARIGHT
6
       The witness, after having first been duly
7
   sworn to speak the truth, the whole truth and nothing
8
   but the truth testified as follows:
9
              EXAMINATION
10
   BY MR. DUKES:
11
   Q.  Would you tell me your full name, please, and
12
       the correct spelling?
13
   A.  Alecia Michelle Crenshaw Searight.
14
   Q.  Can you spell that for me, please?
15
   A.  A-L-E-C-I-A, Michelle, M-I-C-H-E-L-L-E,
16
       Crenshaw, C-R-E-N-S-H-A-W, Searight,
17
       S-E-A-R-I-G-H-T.
18
   Q.  Other than Alecia Michelle Crenshaw or Alecia
19
       Michelle Crenshaw Searight, have you ever used
20
       any other names?
21
   A.  I go by Lisa.
22
   Q.  Is that what most people call you?
23

Page 5

1  Q. I need you to answer out loud.
2  A. Yes, sir.
3  Q. I know you heard what I said to your husband
4     and your son here. It's just to make sure the
5     record has on there the answer you intended to
6     give. I need you to answer out loud yes or no
7     because uh-huhs and huh-uhs and head nods and
8     shakes and all of that, it gets confusing.
9     And I want to make sure the record has what
10    you intended to say.
11        Also, if you don't understand my question
12    or don't hear me, let me know and I'll do
13    whatever I can to try to help us communicate
14    as well as we can.
15        Where were you born, Ms. Searight?
16 A. Butler County.
17 Q. Where in Butler County?
18 A. By Pine Level.
19 Q. What's your date of birth?
20 A. It's 10/4/68.
21 Q. Were you raised in Butler County?
22 A. Yes, sir.
23 Q. When did you move to Lowndes County?

Page 6

1  A. When I was 19 years old.
2  Q. What brought you to Lowndes County?
3  A. My husband.
4  Q. Who was that?
5  A. John A. Searight.
6  Q. You didn't marry him when you were 19, did
7     you?
8  A. No, sir.
9  Q. Did y'all have a common-law marriage when you
10    were 19?
11 A. No, sir.
12 Q. What's your social security number?
13 A. 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.
14 Q. Do you live at 311 North Pollard?
15 A. Yes, sir.
16 Q. And listening to the deposition of your
17    husband, the different addresses that he gave,
18    have you lived at those addresses with him at
19    the same time he did?
20 A. Yes, sir.
21 Q. Lived anyplace else?
22 A. No, sir.
23 Q. Any of your parents still living?

Page 7

1  A. Both of them.
2  Q. What's your father's name?
3  A. Johnny Crenshaw.
4  Q. Where does he live?
5  A. He live in Butler County.
6  Q. What kind of works does he do?
7  A. He disabled.
8  Q. What did he do before he became disabled?
9  A. He work in paper wood.
10 Q. What's your mother's name?
11 A. Lizzie Mae Crenshaw.
12 Q. Did she do any work outside the home?
13 A. No, sir.
14 Q. Is she also in Butler County?
15 A. Yes, sir.
16 Q. Did you go to high school?
17 A. Yes, sir.
18 Q. Did you graduate?
19 A. No, sir.
20 Q. What was the highest grade you finished?
21 A. The eleventh.
22 Q. Where did you go to high school?
23 A. Calhoun High.

Page 8

1  Q. Have you gotten a GED since then?
2  A. No, sir.
3  Q. Been to any other type of job training or --
4  A. Yes, sir.
5  Q. -- education?
6  A. I went to one in Montgomery.
7  Q. What was that for?
8  A. Job training.
9  Q. Was it training in a particular field?
10 A. I had basic training.
11 Q. Do you attend church anywhere once a month or
12    more often?
13 A. Yes, sir.
14 Q. Where is that?
15 A. I go to Bethlehem Christian Church in Fort
16    Deposit, and I go to Freedom Life Christian
17    Church. That in Fort Deposit.
18 Q. Is Freedom Life Church associated with any
19    denomination?
20 A. Not as I know.
21 Q. Is it Freedom Life or Freedom Light?
22 A. Life.
23 Q. Are you a member of any type of organization,

Page 9

1      whether it's a fraternal, professional,
2      benevolence, union, social clubs, church
3      organizations, masons, Eastern Star? Anything
4      like that?
5   A. No, sir.
6   Q. Have you ever been a member of any of those
7      types of organizations?
8   A. No, sir.
9   Q. And your husband is John Arthur Searight, Sr.;
10     is that correct?
11  A. Yes, sir.
12  Q. And you were formally married to him about a
13     year-and-a-half ago?
14  A. Yes, sir.
15  Q. That was here in Lowndes County?
16  A. We got married at Bethlehem Christian Church
17     there in Fort Deposit.
18  Q. That's in Lowndes County?
19  A. Yes, sir.
20  Q. And you and John Searight, Sr. had three
21     children together?
22  A. Yes, sir.
23  Q. And that's John, Jr. that we've been calling

Page 10

1      Candy Man; is that right?
2   A. Yes, sir.
3   Q. And you've got two daughters. What are their
4      names?
5   A. Julisa.
6   Q. Can you spell it for me?
7   A. J-U-L-I-S-A Crenshaw.
8   Q. How old is she?
9   A. She's 16. And Jessica Crenshaw.
10  Q. J-E-S-S-I-C-A?
11  A. Yes, sir.
12  Q. How old is she?
13  A. Twenty.
14  Q. Where does Julisa live?
15  A. With us.
16  Q. Where does Jessica live?
17  A. Her grandmother, Daisy Mae Searight.
18  Q. Other than this marriage to John Searight,
19     have you been married any other times?
20  A. No, sir.
21  Q. Do you have any other children than these
22     three?
23  A. No, sir.

Page 11

1   Q. Have you ever been arrested for anything,
2      Ms. Searight?
3   A. No, sir.
4   Q. Your husband said that Candy Man is a slow
5      learner. Is he in regular classes at school
6      or is he in --
7   A. He got one special education class at school.
8   Q. And that's the only one?
9   A. (Witness nods head positively.)
10  Q. Does he get any type of check for a disability
11     like that?
12  A. Yes, sir.
13  Q. What is that check for?
14  A. It's a learning -- He got a
15     learning disability, LSD.
16  Q. LSD.
17     How much is that check a month?
18  A. 603.
19  Q. Six hundred and three dollars?
20  A. Yes, sir.
21  Q. Do any of your other children get a check like
22     this?
23  A. No, sir.

Page 12

1   Q. Julisa and Jessica are not disabled in any
2      way?
3   A. No, sir.
4   Q. Where do you work, Ms. Searight?
5   A. I don't work.
6   Q. When is the last time you had a full or
7      part-time job?
8   A. It was at Priester Pecans. That was at 2004.
9   Q. What did you do there?
10  A. I was working in the candy kitchen.
11  Q. What did you do there in the candy kitchen?
12  A. Working with candy.
13  Q. Cook or -- I don't know what it's called --
14     candy maker?
15  A. I cook sometimes and then I help roll the
16     candy up.
17  Q. How long did you work at Priester Pecans?
18  A. That was a seasonal job.
19  Q. What was the last job you had before that?
20  A. That was the last one.
21  Q. You haven't had any jobs before that one?
22  A. No, sir.
23  Q. Never had any type of part-time or full-time

Page 13

1   job?
2   A. No, sir.
3   Q. Do you get any type of disability check?
4   A. No, sir.
5   Q. What kind of disability check does your
6      husband get?
7   A. A slow learner.
8   Q. How much does he get a month for that?
9   A. 603.
10  Q. There's been some talk about the day this
11     incident occurred between Candy Man and
12     Officer Campbell. What is your understanding
13     of what date that was?
14  A. I would say the mid-summer. I can't recall
15     what day.
16  Q. Do you recall what month it was?
17  A. No, sir.
18  Q. Would this have been mid-summer of last year?
19  A. Yes, sir.
20  Q. So it would have been mid-summer 2005?
21  A. Yes, sir.
22  Q. Do you recall what day of the week it happened
23     on?

Page 14

1   A. No, sir.
2   Q. This would have been while school was out?
3   A. Yes, sir.
4   Q. Do you know where this incident took place?
5   A. At my sister-in-law house and my
6      brother-in-law house.
7   Q. Whose house was that?
8   A. Pap Searight.
9   Q. And they live in a trailer down at the corner
10     of Pollard Street and Mason something?
11  A. Yes, sir.
12  Q. How did you first learn about this incident?
13  A. My brother-in-law came and told me and my
14     husband.
15  Q. And that's Pap?
16  A. Yes, sir.
17  Q. What did he tell you?
18  A. He told us that Curt come down there choking
19     our baby.
20  Q. Did he tell you anything else?
21  A. Just told he was down there choking him.
22  Q. He came up and told you it was Curt Campbell?
23  A. Yes, sir.

Page 15

1   Q. Did you know Curt Campbell before this?
2   A. Yes, sir.
3   Q. How did you know him before?
4   A. He the police officer that be covering down
5      that way, come patrol the neighborhood.
6   Q. Had you ever had any personal contact with him
7      before this incident?
8   A. No, sir.
9   Q. Was there a time when some kids were flipping
10     off lights in the houses in the project that
11     he brought some kids to you and you spanked
12     them?
13  A. Yes, sir.
14  Q. Tell me about that incident.
15  A. I was over there visiting my mother-in-law at
16     that time. He brought my two daughters, my
17     niece, and my son to me and told me they were
18     flipping lights and stuff. And he told me to
19     whip them, and I whipped them in front of
20     him. I whipped them two times in front of
21     him.
22  Q. What else do you recall about that incident?
23  A. That's all.

Page 16

1   Q. How long before the incident that we're here
2      about now did that occur?
3   A. I don't understand the question.
4   Q. The time that the kids were caught flipping
5      off the lights, how long before this incident
6      with Curt Campbell that Candy Man was involved
7      in did that occur?
8   A. That been about a year ago about the lights
9      and stuff. That was about two or three years
10     ago.
11  Q. And as soon as Pap came up and told you this
12     was going on, what did you do?
13  A. We got up and went down there.
14  Q. How long did it take you to get there?
15  A. About two to three minutes.
16  Q. How far is it from your house to where this
17     was taking place?
18  A. I'd say about a hundred to fifty yards.
19  Q. A hundred to fifty?
20  A. Yeah.
21  Q. What did you see when you got there?
22  A. My son was down on -- squatting down, sweated
23     down, snot coming out of his nose and some

4 (Pages 13 to 16)

### Page 17

1. white stuff was coming out of his mouth. He
2. was crying, and his handcuffs was up under his
3. knees on the ground.
4. Q. What was Curt Campbell doing?
5. A. Standing up.
6. Q. What was Candy Man doing? Was he sitting on
7. the ground?
8. A. No. He was squatting down.
9. Q. What was the first thing you recall being said
10. when you got there?
11. A. My husband told me to get back out the way so
12. he went down there and talked to him. I moved
13. on back up out the way.
14. Q. How far were you away from Candy Man at this
15. time?
16. A. I don't remember the distance.
17. Q. Were you close enough that you could hear
18. everything that was going on?
19. A. No, sir.
20. Q. What do you recall hearing, if anything, going
21. on down there?
22. A. I ain't heard nothing.
23. Q. How long was it after you and your husband got

### Page 18

1. there before Officer Campbell took the
2. handcuffs off of Candy Man?
3. A. I don't know. It wasn't right then.
4. Q. Do you know how long it was?
5. A. I don't know. Not the best of my knowledge.
6. I don't know.
7. Q. What happened after he took the handcuffs off
8. of Candy Man?
9. A. My son came to me where I was.
10. Q. What did he do when he got to where you were?
11. A. I was looking at him and stuff and see what
12. wrong with him.
13. Q. Did you see anything wrong with him?
14. A. Yes, sir.
15. Q. What did you see wrong with him?
16. A. I saw a bruise around his neck, and his neck
17. was swelling up.
18. Q. When you first got down there, did you say
19. that Candy Man was still struggling with the
20. handcuffs?
21. A. He wasn't struggling. Was squat down. He
22. wasn't struggling.
23. Q. When you were looking at Candy Man to see the

### Page 19

1. bruising and swelling on his neck, did he say
2. anything to you?
3. A. No. Because he was still crying.
4. Q. Did he say anything to Officer Campbell?
5. A. No, sir.
6. Q. Did you hear him say anything about I'm going
7. to kill you?
8. A. No, sir.
9. Q. Never at all?
10. A. No, sir.
11. Q. What happened after that?
12. A. Me and my husband, both of us got up by his
13. waist and stuff and took him home.
14. Q. Did he walk home?
15. A. We helped him home. He was limping.
16. Q. Where was he limping?
17. A. In the leg.
18. Q. Which leg?
19. A. His right leg.
20. Q. How long did it take y'all to get home?
21. A. Not that long.
22. Q. Well, how long is that?
23. A. I don't know how many distance.

### Page 20

1. Q. Did it take you a long time to get home?
2. A. No, sir.
3. Q. What happened when you got home?
4. A. We laid him down on the sofa, and we asked --
5. we were asking him and stuff and questioning
6. him. He ain't answered us right then because
7. he kept crying and stuff. We saw the bruises
8. and stuff and saw the neck swelling up, and I
9. told my husband to go use the neighbor phone
10. to call the ambulance
11. Q. So who went and used the phone to call
12. ambulance?
13. A. I did. I went and used the neighbor phone.
14. Q. And you called the ambulance because he was
15. crying and had a bruise on his neck?
16. A. His neck was swelling up, and he told me he
17. couldn't hardly breathe and stuff.
18. Q. What ambulance came?
19. A. Hayneville.
20. Q. Is there a name for it?
21. A. Haynes.
22. Q. Haynes Ambulance came.
23.    What did they do when they got there?

Page 21

1  A. They came to check him and stuff and asked
2     what all happened and stuff, and then they put
3     a neck brace on him and picked him up and put
4     him on the bed and took him out to the
5     ambulance.
6  Q. When you were talking with Candy Man before
7     the ambulance got there, could he talk with
8     you?
9  A. Not right then.
10 Q. How were you communicating with him?
11 A. I had to keep asking him because he kept
12    crying and stuff.
13 Q. Was he able to talk with you?
14 A. He told his daddy.
15 Q. Did you hear him talking?
16 A. Huh-uh (negative response). His daddy told me
17    what went on.
18 Q. Well, did he tell you that he was having
19    trouble breathing?
20 A. His daddy told me that he was telling him.
21 Q. He wasn't telling you?
22 A. Huh-uh (negative response).
23 Q. Why was that?

Page 22

1  A. Because I was answering the questions for the
2     ambulance people. I was answering the
3     questions they was asking me.
4  Q. So the ambulance people came, and they put a
5     collar on his neck and put him on a bed. Did
6     they do anything else?
7  A. They was examining and stuff and asking him
8     what happened and stuff.
9  Q. Did they look at his neck?
10 A. Yes, sir.
11 Q. Did you ride with Candy Man in the ambulance
12    to the hospital?
13 A. Yes, sir.
14 Q. On the way to the hospital, did they give him
15    any oxygen?
16 A. No, sir.
17 Q. Do you know what I mean by that?
18 A. I --
19 Q. Those little tubes they put up to your nose,
20    you didn't see them do that?
21 A. No, sir.
22 Q. What happened on the ride to the hospital?
23 A. They kept asking him where he were hurting at,

Page 23

1     and he was showing it to them where he were
2     hurting at. They kept looking at it and
3     writing it down. Then he went to sleep. They
4     tried -- told him, don't go to sleep; told him
5     to keep awoke.
6  Q. They said what?
7  A. Don't go to sleep. Told him to stay woke.
8  Q. What else?
9  A. That's all I remember until we got to the
10    hospital.
11 Q. What happened when you got to the hospital?
12 A. They took him back to the emergency room side
13    and put us in a room, and the doctor came and
14    examined him and stuff and told him his neck
15    was bruised and stuff. And they gave him some
16    medication -- prescription to fill out and
17    told us to follow up with his regular doctor.
18 Q. Who was the doctor that you saw there?
19 A. I can't remember his name.
20 Q. This was Stabler Hospital in Greenville?
21 A. Yes, sir.
22 Q. What kind of medicine did they give you?
23 A. They give him a prescription for us to go fill

Page 24

1     it. Some antibiotics and pain pills and stuff
2     for the neck.
3  Q. They gave him an antibiotic?
4  A. Uh-huh (positive response).
5  Q. What was that for?
6  A. The prescription for the pain and infection.
7  Q. What kind of infection did he have?
8  A. I guess he had a infection because his neck
9     was swollen and bruised.
10 Q. Was he cut anywhere?
11 A. No, sir.
12 Q. Was he scraped anywhere?
13 A. No, sir.
14 Q. Was his skin broken anywhere?
15 A. Not that I saw.
16 Q. Where did you take the prescriptions to be
17    filled?
18 A. D & K Pharmacy down in Lowndes County.
19 Q. D & K?
20 A. Pharmacy.
21 Q. And they are in Fort Deposit?
22 A. Yes, sir.
23 Q. Did you follow up with Candy Man's regular

Page 25

1  doctor?
2  A. Yes, sir.
3  Q. And who is that?
4  A. Dr. Golomb.
5  Q. When did you first take Candy Man to see
6     Dr. Golomb?
7  A. About two or three days later.
8  Q. Where is Dr. Golomb's office?
9  A. He there in Fort Deposit.
10 Q. Does he have an office anywhere else?
11 A. In Montgomery.
12 Q. What's his first name?
13 A. Phil.
14 Q. What happened when y'all got to Dr. Golomb's
15    office?
16 A. We had told him what went on, and he X-rayed
17    it and checked it and stuff and gave him some
18    more pills and told him stay at home for two
19    weeks.
20 Q. What kind of pills did he give?
21 A. Some headaches and back pills.
22 Q. Why did he give him headache pills?
23 A. He told him he was having headaches.

Page 26

1  Q. He had been having headaches before this
2     incident, hadn't he?
3  A. Yes, sir.
4  Q. Why did he give him back pills?
5  A. He was complaining about his back.
6  Q. Give him any pills for his neck?
7  A. Yes, sir. All of it was in the same bottle.
8  Q. One pill will cover all of that?
9  A. That's what he had on the bottle.
10 Q. You don't remember what the medicine was?
11 A. No, sir.
12 Q. Where did you take it to get it filled?
13 A. D & K Pharmacy.
14 Q. The time you went to the emergency room at
15    Stabler and then this time you went to see
16    Dr. Golomb, was that the only times you took
17    Candy Man to the doctor?
18 A. I took him back to Dr. Golomb again.
19 Q. When did you take him back to Dr. Golomb
20    again?
21 A. When he told me to bring him back after the
22    two weeks and let him check his neck again.
23 Q. What happened on that visit?

Page 27

1  A. He gave him some more pills.
2  Q. Did he give you another prescription for them?
3  A. Yes, sir.
4  Q. What were those pills for, the same thing?
5  A. Yes, sir.
6  Q. Did you get those filled at D & K Pharmacy?
7  A. Yes, sir.
8  Q. Any other medical treatment that Candy Man has
9     had as a result of this?
10 A. Not as I know of.
11 Q. Dr. Golomb and the emergency room at Stabler
12    are the only places he's been as a result of
13    this incident?
14 A. For medical treatment, yes.
15 Q. Because he had said something about going to
16    Dr. Thomas and then your husband said
17    something about going to a hospital in
18    Dothan.
19 A. Yeah. He went to Laura Oaks.
20 Q. Laura Oaks?
21 A. Yeah.
22 Q. Is that the name of the doctor?
23 A. That's the name of the hospital.

Page 28

1     MR. LEWIS: Laurel Oaks.
2  Q. Where is that?
3  A. In Dothan.
4  Q. Who referred him to that hospital?
5  A. The mental folks up here in Hayneville. The
6     doctor in Hayneville up here.
7  Q. Which doctor is that?
8  A. He go to the mental health. They referred
9     him.
10 Q. Is there a doctor that he sees at mental
11    health?
12 A. Huh-uh (negative response). They and the
13    school refer that because of LSD.
14 Q. Now, when Dr. Golomb told him to stay home for
15    two weeks, he didn't miss any school because
16    of that, did he?
17 A. Yeah. He stayed at home for two weeks.
18 Q. But you said this occurred in the middle of
19    summer when there was no school going on.
20 A. That before school got out.
21 Q. Well, when did this happen, then, because --
22 A. It happened in May. They was still in school,
23    but he wasn't in school that day.

Page 29

1  Q. But I asked you when it happened, and you said
2     it happened in mid-summer when school was
3     out.
4  A. That was the mid-summer.
5  Q. May is the middle of summer?
6  A. No. I said the mid-summer.
7  Q. Did this incident have any affect on Candy
8     Man's behavior afterwards?
9  A. Yes. At home.
10 Q. What --
11 A. He had sleeping disability or he couldn't
12    hardly sleep at night. Wake up hollering and
13    screaming.
14 Q. How long did that go on?
15 A. That go on some months.
16 Q. How many months?
17 A. About three or four months.
18 Q. Has it stopped now?
19 A. He still have them, but he don't have them now
20    but about two time a week. He wake up
21    hollering and screaming like two time a week.
22 Q. Is that how many times it is now, two times a
23    week?

Page 30

1  A. Yes, sir.
2  Q. How many times a week was it those three or
3     four months?
4  A. Regular.
5  Q. How many is -- What kind of week is regular?
6  A. Every night.
7  Q. Every night?
8  A. Every night.
9  Q. Anything else that's changed as far as his
10    behavior or how he lived or carried on?
11 A. He told me he scared -- afraid of the cop
12    now. When he see him and stuff, he get out of
13    his way. He not going to protect him or
14    nothing like that no more. He afraid of him.
15 Q. Do you know how much his bills were for the
16    treatment at the hospital in Greenville?
17 A. No, sir, because Medicaid took care of that.
18 Q. What about his treatment by Dr. Golomb?
19 A. Medicaid.
20 Q. What about his prescriptions?
21 A. Medicaid.
22 Q. Has Medicaid made any type of claim to be
23    reimbursed?

Page 31

1  A. No, sir.
2  Q. Is the only injury that he received the
3     swelling and bruising to his neck?
4  A. Yes, sir.
5  Q. Did you ever take him to the doctor about
6     these nightmares or waking up in the night and
7     hollering?
8  A. That what he go to mental health for. I told
9     the mental health people, and they come and
10    see him and stuff. I told them about it.
11 Q. But he had already been going to see the
12    mental health people before this; is that
13    correct?
14 A. Not for the nightmares.
15 Q. But he had been seeing them for other things,
16    though, right?
17 A. Yes, sir.
18 Q. What things had he been going to see the
19    mental health people for?
20 A. For his learning disability.
21 Q. Other than this lawsuit, Ms. Searight, have
22    you ever sued anyone for anything?
23 A. No, sir.

Page 32

1  Q. Do you know if your husband has ever sued
2     anyone for anything?
3  A. No, sir.
4  Q. Have you or your husband sued on behalf of any
5     of your children before this lawsuit?
6  A. No, sir.
7  Q. Anyone ever sued you?
8  A. No, sir.
9  Q. Anyone ever sued your husband?
10 A. No, sir.
11 Q. How many times before this has Candy Man been
12    expelled or suspended from school?
13 A. To the best of my knowledge, about five or six
14    times.
15 Q. What was he expelled for?
16    MR. LEWIS: Object to the form.
17 A. I can't remember all the incidents that he was
18    expelled for.
19 Q. Well, was he ever expelled for fighting?
20 A. One time. It was this Wednesday.
21 Q. This last Wednesday?
22 A. Yeah. For one day.
23 Q. Any other times?

### Page 33

1. A. No, sir.
2. Q. Was he ever expelled or suspended from school
3.     before this incident with Officer Campbell?
4. A. About what? I don't understand the question.
5. Q. For any reason.
6. A. Not as I know.
7. Q. So he was never expelled or suspended before
8.     May of 2005?
9. A. Not that I recall.
10. Q. So these five or six times he's been expelled
11.     or suspended have been since May of 2005?
12. A. Yes, sir.
13. Q. Are you sure?
14. A. Repeat the question again.
15. Q. This incident with Officer Campbell occurred
16.     in the middle of May of last year; is that
17.     correct?
18. A. Yes, sir.
19. Q. Before that time had Candy Man ever been
20.     expelled or suspended from school?
21. A. Yes, sir.
22. Q. How many times had he been expelled before?
23. A. To the best of my knowledge, five or six

### Page 34

1.     times.
2. Q. And how many times has he been expelled or
3.     suspended from school since that incident in
4.     May of 2005?
5. A. One. That was last Wednesday.
6. Q. When is the last time you talked with Candy
7.     Man about this incident?
8. A. He doesn't talk much to me about it. Him and
9.     his daddy talk about it.
10. Q. When is the last time he and his daddy talked
11.     about it?
12. A. I don't know.
13. Q. Did they talk about it this morning?
14. A. I don't know.
15. Q. Talk about it last night?
16. A. I don't know.
17. Q. When is the last time you talked about it with
18.     him?
19. A. I said him and his daddy talk about it. Me
20.     and him don't talk about it.
21. Q. Why is that?
22. A. Him and his daddy talk. Father and son talk.
23. Q. Where do they go to talk about it that they

### Page 35

1.     don't talk about it around you?
2. A. They go riding.
3. Q. When is the last time you and your husband
4.     talked about this?
5. A. The only time me and him talked about it was
6.     last night.
7. Q. So you talked about it before your deposition
8.     today?
9. A. Yes, sir.
10. Q. What did y'all talk about last night?
11. A. We just went over the deposition.
12. Q. What did you go over as far as the deposition?
13. A. Just tell the truth and don't tell no story.
14. Q. Did y'all go over anything with Candy Man
15.     about the deposition?
16. A. The same thing: Tell the truth; don't tell no
17.     story.
18. Q. Did y'all talk about what y'all were going to
19.     say at the deposition?
20. A. No, sir.
21. Q. You didn't go over the facts of what happened
22.     with Candy Man before today?
23. A. Huh-uh (negative response).

### Page 36

1. Q. Whose decision was it to file this lawsuit?
2. A. My husband.
3. Q. Did you have any say in that?
4. A. No, sir.
5. Q. What's your understanding of what this lawsuit
6.     is asking for as far as money?
7. A. I don't understand the question.
8. Q. How much money is being -- is this lawsuit
9.     asking that Candy Man get?
10. A. I never talked about that.
11. Q. Have you ever read the complaint?
12. A. No, sir.
13. Q. You have no idea how much money is being asked
14.     for in this complaint?
15. A. I'm not in for the money. I'm in for justice.
16. Q. What kind of justice do you want?
17. A. I want him -- let him know don't do no other
18.     kid like that because he could have killed my
19.     son.
20. Q. Have you talked to Candy Man since that time
21.     about shooting birds at people?
22. A. No, sir.
23. Q. You never talked to him about don't shoot

Deposition of Alecia Searight					March 3, 2006

Page 37

1  birds at police officers?
2  A. He say he didn't do it. He said he shot it at
3     his auntie.
4  Q. Did you tell him anything about shooting birds
5     at his auntie?
6  A. They always play like that.
7  Q. Does he shoot birds at his schoolteachers?
8  A. No, sir.
9  Q. Does he shoot birds at his principal?
10 A. No, sir.
11 Q. Why is that?
12 A. You don't supposed to shoot birds at your
13    principal and your schoolteacher.
14 Q. How many times before this incident in May of
15    2005 had Candy Man been in trouble or had any
16    involvement with the Fort Deposit police?
17 A. Rephrase the question.
18 Q. Before this incident in May of 2005, how many
19    times had Candy Man been involved in things
20    where the Fort Deposit police had to get
21    involved?
22 A. You said before?
23 Q. Yes, ma'am.

Page 38

1  A. Just one time when I whipped them over there
2     at his grandma's house. That's all I
3     remember.
4  Q. Are you aware of claims that he's thrown rocks
5     and shot BB guns at dogs?
6  A. Nobody never told me those.
7  Q. Are you aware of people accusing him of
8     breaking out windows?
9  A. No, sir.
10 Q. Are you aware of him being accused of groping
11    a young girl at school?
12 A. I heard about that at the schoolhouse.
13 Q. Who did you hear about that from?
14 A. The principal.
15 Q. What happened as a result of that?
16 A. It was dismissed.
17 Q. What happened --
18 A. It was dismissed.
19 Q. Was Candy Man suspended or expelled as a
20    result of that?
21 A. No, sir.
22 Q. Did you talk with him about that?
23 A. His dad did.

Page 39

1  Q. Did you know about the time that Officer
2     Campbell had to take a BB gun away from him
3     and some boys that were shooting birds in the
4     city?
5  A. He never took a gun away from my son.
6  Q. Were you aware that Candy Man has been
7     shooting birds? I'm talking about birds that
8     fly and sing.
9  A. No, sir.
10 Q. You weren't aware of that?
11 A. No, sir.
12 Q. Were you aware of times where he had
13    firecrackers and lighters that were taken away
14    from him?
15 A. No, sir.
16 Q. Are you aware of him ever cussing at adults?
17 A. No, sir.
18 Q. Were you aware of the time where he hit
19    another boy at Calico Fort?
20       MR. LEWIS: Object to the form.
21 Q. Are you aware of that?
22 A. Yes, sir.
23 Q. I'll rephrase the question. Are you aware of

Page 40

1     him ever slapping another boy at Calico Fort?
2        MR. LEWIS: Object to the form.
3  A. He didn't slap.
4  Q. What did he do?
5  A. I wasn't there. I was working. I wasn't
6     around there where the accident went on at.
7  Q. How do you know he didn't slap him?
8  A. Because he told me. My son don't lie.
9  Q. He's never told you anything that wasn't true?
10 A. No, sir.
11 Q. He's always told you the truth?
12 A. Yes, sir.
13 Q. Does he tell you every time he gets in
14    trouble?
15 A. Yes, sir.
16 Q. Since the incident in mid-May of 2005
17    involving Officer Campbell, have you talked
18    with any of the people that were there at the
19    scene?
20 A. No, sir.
21 Q. You haven't asked any of them what they saw
22    happen?
23 A. They talked to my husband. They didn't talk

10 (Pages 37 to 40)

Page 41

1   to me.
2   Q.  Why wouldn't they talk to you?
3   A.  Because I wasn't down there talking when it
4       went on. They talked to him.
5   Q.  But as a mother concerned about your son, did
6       you ever ask any of these people what they saw
7       happened?
8   A.  My husband asked them. My husband told me.
9   Q.  But you didn't bother to ask any of them?
10  A.  No, sir.
11  Q.  You didn't talk to your brother-in-law or
12      sister-in-law or any of your other in-laws who
13      were there?
14  A.  No, sir.
15  Q.  Did any of them ever come to you and tell you
16      what they saw happen?
17  A.  Only one came to me, my brother-in-law.
18  Q.  And that was when this was going on?
19  A.  Yes, sir.
20  Q.  And where this incident occurred, that was on
21      your brother-in-law's property, right?
22  A.  Yes, sir.
23  Q.  Didn't any of it occur in your yard or in your

Page 42

1       house, did it?
2   A.  No, sir.
3   Q.  Based on what you've heard, is it your belief
4       that Officer Campbell was deliberately trying
5       to hurt Candy Man?
6   A.  Yes, sir.
7   Q.  What makes you think that?
8   A.  You not supposed to choke nobody, not even --
9       especially a minor. You not supposed to choke
10      nobody.
11  Q.  What do you think that Officer Campbell should
12      have done after he was hit by Candy Man?
13          MR. LEWIS: Object to the form.
14  A.  Rephrase the question.
15  Q.  What do you think would have been the
16      appropriate response by Officer Campbell after
17      Candy Man hit him in the face?
18          MR. DUKES: Object to the form.
19  A.  He could have told one of the adults that was
20      there.
21  Q.  And how would that have stopped Candy Man from
22      hitting him in the face again?
23          MR. LEWIS: Object to the form.

Page 43

1   A.  Rephrase the question.
2   Q.  You're saying, as I understand it, that
3       Officer Campbell after Candy Man hit him in
4       the face should have told one of the adults to
5       do something?
6   A.  You say he hit him in the face. My son say he
7       didn't hit him in the face.
8   Q.  And your son always tells you the truth?
9   A.  Yes, sir.
10          MR. DUKES: I don't have any more
11          questions, Ms. Searight.
12          MR. LEWIS: I've got one.
13          EXAMINATION
14  BY MR. LEWIS:
15  Q.  Mr. Dukes asked you about an incident in which
16      you whipped four of the kids that Officer
17      Campbell brought to your mother's house or
18      your mother-in-law's house.
19  A.  Mother-in-law's.
20  Q.  Was there an incident involving a ring during
21      that?
22  A.  Yeah. I had lost my ring at my
23      mother-in-law's house, and he picked it up and

Page 44

1       told me to whip them -- before I give it back
2       to you, he told me to whip them again. And
3       when I whip them again, that made two times I
4       whipped them with a belt.
5   Q.  How many licks did you give each one of them?
6   A.  Three apiece.
7   Q.  The first time and then three apiece the
8       second time; is that right?
9   A.  Yes, sir.
10  Q.  Did you have any idea at that time why Officer
11      Campbell told you to -- Let's back up.
12          Did Officer Campbell specifically tell you
13      that he would give you the ring back if you
14      hit the kids again?
15  A.  Yes, sir.
16  Q.  Did you have any idea why he was saying that?
17  A.  No, sir.
18  Q.  But you followed directions?
19  A.  Yes, sir.
20          MR. LEWIS: No further questions.
21          EXAMINATION
22  BY MR. DUKES:
23  Q.  Ms. Searight, when Candy Man gives people the

Page 45

1      finger or shoots a bird to them, what type of
2      communication or what type of expression is he
3      giving by that?
4  A. He just only do it to his auntie. I don't
5      remember nobody else he done it to.
6  Q. If he were to give it to one of his teachers
7      or principal, that would be a sign of
8      disrespect, wouldn't it?
9  A. Yes, sir.
10 Q. And based on your experience, do you know that
11     some people, if they get a bird from somebody,
12     that's kind of an invitation to fight, isn't
13     it?
14        MR. DUKES: Object to the form.
15        Lack of predicate.
16 A. Rephrase the question.
17 Q. If you were driving down the road and somebody
18     shot you the bird, you would think that was
19     disrespectful, wouldn't you?
20 A. I go on about my business.
21 Q. That would be an insult to you, wouldn't it?
22 A. I would just take it and go on.
23 Q. That would be an insult, though, wouldn't it?

Page 46

1  A. I wouldn't let it bother me, though.
2  Q. It would be disrespectful, wouldn't it?
3  A. Yes, sir.
4        MR. DUKES: Thank you, ma'am.
5        (Deposition concluded at
6        approximately 4:50 p.m.)
7      * * * * * * * * * * * *
8      FURTHER DEPONENT SAITH NOT
9      * * * * * * * * * * *
10
11      REPORTER'S CERTIFICATE
12 STATE OF ALABAMA:
13 MONTGOMERY COUNTY:
14    I, Pamela A. Wilbanks, Registered
15 Professional Reporter and Commissioner for the State
16 of Alabama at Large, do hereby certify that I
17 reported the deposition of:
18      ALECIA SEARIGHT
19 who was first duly sworn by me to speak the truth,
20 the whole truth and nothing but the truth, in the
21 matter of:
22      J.S., (a minor child by
23      and through his father and

Page 47

1      next friend, JOHN SEAWRIGHT)
2      Plaintiff,
3      Vs.
4      OFFICER CURT CAMPBELL, in
5      his individual capacity,
6      Defendant.
7      In The U.S. District Court
8      For the Middle District of Alabama
9      Northern Division
10     02:05-CV-928-WKW
11 on Friday, March 3, 2006.
12    The foregoing 46 computer printed pages
13 contain a true and correct transcript of the
14 examination of said witness by counsel for the
15 parties set out herein. The reading and signing of
16 same is hereby waived.
17    I further certify that I am neither of kin
18 nor of counsel to the parties to said cause nor in
19 any manner interested in the results thereof.
20    This 9th day of March, 2006.

Page 48

            _____
            Pamela A. Wilbanks, Registered
            Professional Reporter and
            Commissioner for the State
            of Alabama at Large.