# Exhibit 4
# Deposition of John Searight

## Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2         FOR THE MIDDLE DISTRICT OF ALABAMA
 3                  NORTHERN DIVISION
 4
 5   J.S., (a minor child by
     and through his father and
 6   next friend, JOHN SEAWRIGHT),
 7       Plaintiff,
 8   Vs.                 CIVIL ACTION NO.
                         02:05-CV-928-WKW
 9   OFFICER CURT CAMPBELL, in
     his individual capacity,
10
         Defendant.
11
12           * * * * * * * * * * * *
13
14       DEPOSITION OF JOHN A. SEARIGHT, SR., taken
15   pursuant to stipulation and agreement before Pamela
16   A. Wilbanks, Registered Professional Reporter and
17   Commissioner for the State of Alabama at Large, in
18   the Richardson Legal Center, 133 Hayneville Plaza,
19   Hayneville, Alabama, on Friday, March 3, 2006,
20   commencing at approximately 3:00 p.m.
21
22           * * * * * * * * * * * *
23
```

## Page 2

```
 1
 2                  APPEARANCES
 3
 4   FOR THE PLAINTIFF:
 5   Mr. Jay Lewis
     LAW OFFICES OF JAY LEWIS & ASSOCIATES
 6   Attorneys at Law
     847 South McDonough Street
 7   Suite 100
     Montgomery, Alabama
 8
     FOR THE DEFENDANT:
 9
     Mr. S. Mark Dukes
10   NIX, HOLTSFORD, GILLILAND, HIGGINS & HITSON
     Attorneys at Law
11   4001 Carmichael Road - Suite 300
     Montgomery, Alabama 36106
12
     ALSO PRESENT:
13
     Mrs. Searight
14   Officer Curt Campbell
15
16
17
             * * * * * * * * * * * *
18
             EXAMINATION INDEX
19
     BY MR. DUKES . . . . . . . . . . 4
20
             * * * * * * * * * * * *
21
22
23
```

## Page 3

```
 1              STIPULATION
 2       It is hereby stipulated and agreed by and
 3   between counsel representing the parties that the
 4   deposition of JOHN A. SEARIGHT, SR. is taken pursuant
 5   to the Federal Rules of Civil Procedure and that said
 6   deposition may be taken before Pamela A. Wilbanks,
 7   Registered Professional Reporter and Commissioner for
 8   the State of Alabama at Large, without the formality
 9   of a commission, that objections to questions other
10   than objections as to the form of the question need
11   not be made at this time but may be reserved for a
12   ruling at such time as the said deposition may be
13   offered in evidence or used for any other purpose by
14   either party provided for by the Statute.
15       It is further stipulated and agreed by and
16   between counsel representing the parties in this case
17   that the filing of said deposition is hereby waived
18   and may be introduced at the trial of this case or
19   used in any other manner by either party hereto
20   provided for by the Statute regardless of the waiving
21   of the filing of the same.
22       It is further stipulated and agreed by and
23   between the parties hereto and the witness that the
```

## Page 4

```
 1   signature of the witness to this deposition is hereby
 2   waived.
 3
 4           * * * * * * * * * * * *
 5
             JOHN A. SEARIGHT, SR.
 6
         The witness, after having first been duly
 7
     sworn to speak the truth, the whole truth and nothing
 8
     but the truth testified as follows:
 9
             EXAMINATION
10
     BY MR. DUKES:
11
     Q.  Give me your full name, please, sir.
12
     A.  John A. Searight.
13
     Q.  And is that "A" for Arthur?
14
     A.  Yes. That's the way we go.
15
     Q.  Do you go by John A. Searight, Sr. or just
16
         John A. Searight?
17
     A.  Senior.
18
     Q.  Mr. Searight, you're the father of John A
19
         Searight, Jr.; is that correct?
20
     A.  Yes, sir.
21
     Q.  And you were here throughout his deposition
22
         when I took it earlier today; is that correct?
23
```

Page 5

1  Q. And your wife was here throughout his
2     deposition too; is that also correct?
3  A. Yes, sir.
4  Q. Mr. Searight, I'm going to tell you briefly
5     some of the same stuff I told your son that
6     everybody has been referring to as Candy Man.
7     This is my only chance I get to talk to you
8     unless we go to trial. I mean, you can talk
9     to your lawyer anytime you want to, pick up
10    the phone and talk to him, and he can do the
11    same. But this is the only time I get to talk
12    with you so I want to make sure I communicate
13    as effectively as possible.
14        MR. LEWIS: Let me interject there
15        because you talked about his
16        lawyer. I'm not altogether sure
17        of the legal posture of this.
18        Technically I only represent his
19        son by and through him.
20        MR. DUKES: Okay.
21        MR. LEWIS: I'm here to defend the
22        deposition. I'm a little unclear
23        as to whether or not I have any

Page 6

1        right to claim any sort of
2        privilege with regard to
3        Mr. Searight, and my inclination
4        is not to claim that privilege.
5  Q. That said, you can talk to your son's lawyer
6     anytime; is that right?
7  A. Yes, sir.
8  Q. If I ask you a question and you don't
9     understand it and you don't hear me and you
10    need some additional explanation, please let
11    me know. Okay?
12 A. Yes, sir.
13 Q. I will make sure that we communicate as well
14    as we can. That way, the answer that you give
15    will be to the question that I've asked. Fair
16    enough?
17 A. Yes, sir.
18 Q. If I ask you a question that calls for a yes
19    or no answer, would you answer yes or no
20    rather than nodding your head or shaking your
21    head or wagging a finger or tapping the table
22    or going uh-huh or going huh-uh?
23 A. Yes, sir.

Page 7

1  Q. Because as you can understand, when this gets
2     written out, sometimes that gets confusing and
3     we may not get the answer down that you
4     intended to give. And I want to make sure
5     that we have the answer that you intended to
6     give. Fair enough?
7  A. Yes, sir.
8  Q. Mr. Searight, have you ever used anyother
9     names?
10 A. Jay-Jay. That's my nickname.
11 Q. Do you have any other nicknames?
12 A. No, sir.
13 Q. Where were you born?
14 A. Fort Deposit.
15 Q. Were you raised there?
16 A. Yes, sir.
17 Q. Have you ever lived anywhere else other than
18    Fort Deposit?
19 A. No, sir.
20 Q. What's your date of birth?
21 A. 7/6/65.
22 Q. What's your social security number, please,
23    sir?

Page 8

1  A. 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.
2  Q. I was up with the 422. 11-55 what?
3  A. 5441.
4  Q. 5441.
5     Where do you live, Mr. Searight?
6  A. 311 Pollard Street.
7  Q. How long have you lived at that address?
8  A. About three-and-a-half years.
9  Q. Where did you live before that?
10 A. Down on Golson Drive.
11 Q. Golson Drive?
12 A. Yes, sir. Down there in Fort Deposit too.
13 Q. Is that G-H-O-L-S-E-N?
14 A. Well, I cannot spell Golson Drive.
15 Q. How long did you live there on Golson Drive?
16 A. About two-and-a-half years.
17 Q. Where did you live before that?
18 A. The housing project we call Vietnam. Where
19    Curt Campbell live at now.
20 Q. How long did you live there?
21 A. About three years.
22 Q. Who lives with you at 311 Pollard Street?
23 A. My wife, my two daughters and my son.

### Page 9

1. Q. Both your daughters live with you there?
2. A. No, sir. My oldest daughter stay with my
3.     mother, Daisy Mae Searight.
4. Q. Are either of your parents still living?
5. A. My mother living.
6. Q. What's her name?
7. A. Daisy Mae Searight.
8. Q. If I had been listening better, I would have
9.     realized that, wouldn't I?
10.     What was your father's name?
11. A. Ward Junior Hunter.
12. Q. Ward what?
13. A. Ward Hunter, Jr.
14. Q. Ward Holly, Jr.?
15. A. Hunter, H-U-N-T-E-R. Hunter.
16. Q. When did he pass?
17. A. About maybe five years ago.
18. Q. What kind of work did he do?
19. A. Pulpwood all our life. Paper wood.
20. Q. Does your mother still work anywhere or is she
21.     retired?
22. A. She never worked.
23. Q. Were you raised by your natural parents?

### Page 10

1. A. Yes, sir.
2. Q. Did you go to high school, Mr. Searight?
3. A. Yes, sir.
4. Q. Did you graduate?
5. A. No, sir.
6. Q. What high school did you go to?
7. A. Lowndes County High.
8. Q. What's the highest grade you got to?
9. A. To the ninth.
10. Q. Have you gone back and gotten a GED or
11.     anything like that?
12. A. No, sir.
13. Q. Do you go to church anywhere once a month or
14.     more often?
15. A. Yes. I go every Sunday.
16. Q. Where is that?
17. A. Bethlehem -- We got two churches we go to. We
18.     go at night to New Zion.
19.     THE WITNESS: Ain't it, Lisa? What
20.     the name of it?
21.     MRS. SEARIGHT: Freedom Life.
22. A. Freedom Life. I go there with my wife now.
23. Q. You go to Bethlehem and Freedom Life?

### Page 11

1. A. Yes, sir.
2. Q. What's the full name of the Bethlehem church?
3.     Is it like Bethlehem Missionary Baptist or
4.     Bethlehem something else?
5. A. Baptist --
6.     MRS. SEARIGHT: Christian.
7. A. Christian.
8. Q. Where is that church located?
9. A. At Fort Deposit.
10. Q. Is Freedom Life in Fort Deposit?
11. A. Pollard Street.
12. Q. Pardon me?
13. A. Yes, sir.
14. Q. It's on Pollard Street.
15.     So you don't have very far to go to get to
16.     that one, do you?
17. A. No, sir.
18. Q. Mr. Searight, are you a member of any type of
19.     organization, whether it's a fraternal
20.     organization or a professional organization,
21.     benevolent, union, social club, hunt clubs,
22.     card clubs, pool clubs, masons or anything
23.     like that?

### Page 12

1. A. No, sir.
2. Q. Have you ever been a member of any type of
3.     organization like that?
4. A. No, sir.
5. Q. What is your wife's name?
6. A. Alecia Crenshaw. She married me and became
7.     Alecia Searight -- Michelle Searight.
8. Q. And how long have y'all been married?
9. A. Probably a year and a few months.
10. Q. Did y'all live together before you got
11.     married?
12. A. Yes, sir.
13. Q. How long have y'all lived together?
14. A. Seventeen years.
15. Q. Have you been married before this marriage?
16. A. No, sir.
17. Q. Where did your marriage take place?
18. A. At Bethlehem church.
19. Q. And that's in --
20. A. Fort Deposit.
21. Q. Lowndes County?
22. A. Yes, sir.
23. Q. And you and your wife have three children

Page 13

1   together?
2   A. Yes, sir.
3   Q. And that would be John, Jr. and your two
4      daughters?
5   A. Yes, sir.
6   Q. Julisa and Jessica?
7   A. Yes, sir.
8   Q. How do you spell Julisa's name?
9   A. I cannot spell it, but my wife can.
10  Q. Mr. Searight, have you ever been arrested for
11     anything?
12  A. Yes, sir.
13  Q. What was that?
14  A. Distribution of cocaine with -- selling it
15     anyway -- and tickets.
16  Q. You were arrested for selling cocaine?
17  A. Yes, sir.
18  Q. Where did that take place?
19  A. In '92.
20  Q. What county was that in?
21  A. Lowndes County.
22  Q. What happened with that?
23  A. He give me a year and a day in the State

Page 14

1   penitentiary.
2   Q. Any other felony arrests that you have?
3   A. No, sir.
4   Q. The others are traffic arrests?
5   A. One or two times, yes, sir.
6   Q. When did you get through serving your time in
7      the penitentiary for that distribution of
8      cocaine?
9   A. In '93, something like that.
10  Q. Have you ever served in the military?
11  A. No, sir.
12  Q. Where do you work, Mr. Searight?
13  A. I do lawn service for myself.
14  Q. Do you have any employees?
15  A. No, sir. I do it for myself.
16  Q. How long have you been in that line of
17     business?
18  A. Maybe -- Probably two years.
19  Q. What's the name of your lawn service?
20  A. It don't have a name to it. I just -- If
21     somebody want me to cut their yard, I do it.
22  Q. Where did you work before you started your
23     lawn service business?

Page 15

1   A. Let me see. The Airport System. We made
2      jacks (phonetic) and stuff down there at Fort
3      Deposit. Airport. Let me see. Airport
4      Systems, that was the name of it.
5   Q. How long did you work there?
6   A. Maybe about a year.
7   Q. What did you do there?
8   A. I paint the jacks that we made.
9   Q. Where did you work before that?
10  A. I didn't work nowhere.
11  Q. How long was it between when you worked there
12     and the last time you had a job?
13  A. Never had none. I just cut a yard.
14  Q. What I'm trying to figure out is how you
15     supported yourself and your family during that
16     period of time.
17  A. Well, I got disabled and I start ...
18  Q. What kind of disability do you have?
19  A. SSI.
20  Q. What's that for?
21  A. I messed my back up and my legs up in a car
22     wreck. Then in school, special ed, slow
23     learner.

Page 16

1   Q. You were in special ed?
2   A. Yes, sir.
3   Q. You were in special ed in school?
4   A. Yes, sir.
5   Q. Do you get a check because of that too?
6   A. That basically how I got on it the first time.
7   Q. How long have you been drawing a disability
8      check?
9   A. About ten years.
10  Q. When did you first get on it because of your
11     special ed?
12  A. Maybe in '96 or something like that.
13  Q. Let me just ask you this: You're not in this
14     lawsuit making any claim for any kind of money
15     or expenses or anything that you've personally
16     had as a result of this, are you?
17  A. No, sir.
18  Q. The only thing that you're claiming is any
19     expenses or injuries that your son had; is
20     that correct?
21  A. Yes, sir.
22  Q. Going back to the date of this incident, what
23     was the first time that you realized that

Page 17

1  there was something going on on this day with
2  Candy Man and Officer Campbell?
3  A. Me and my wife, we was in the house watching
4     television. And my brother came to the house
5     and told me, Curt Campbell got your son bent
6     down by the neck, and he told Curt Campbell to
7     turn loose or he going to kill him. So me and
8     my wife ran down there.
9  Q. What brother is this?
10 A. Tomeka, the one they call Pap.
11 Q. Tomeka?
12 A. Searight.
13 Q. So he came up to the house and told you about
14    this?
15 A. Yes, sir.
16 Q. Did you go straight down to where this was
17    going on?
18 A. Yes, sir.
19 Q. And your wife went with you?
20 A. Yes, sir.
21 Q. How long did it take you to get from your
22    house to where this was going on?
23 A. From my best information, it would be like

Page 18

1     five to six minutes.
2  Q. How far distance-wise is it from your house to
3     where this was going on?
4  A. About 150 yards. Maybe a little further.
5  Q. What did you see when you got there?
6  A. My boy with his knees on the ground, slob
7     coming out his mouth, crying and just sweating
8     and shirt messed up. And Curt got his hand on
9     his back like that right there. When I got
10    there -- my wife was with me -- I told her to
11    step back. And I said, Officer Campbell, I
12    said, turn my boy loose; let him go. And when
13    I told him to turn him loose and let him go,
14    he wouldn't turn aloose and let him go.
15       There was a lot of neighbors talking and
16    stuff. I told my wife, just stay back right
17    there and I'll talk to Curt myself, because I
18    knew Curt. And he wouldn't let him go. And
19    my boy, snot running out of his nose and big
20    (unintelligible) coming out, and I could tell
21    he had been hurt bad, because I looked at the
22    whelp and stuff from the finger, the way he
23    had him around the neck. I see'd all this.

Page 19

1  Q. What did you see on his neck?
2  A. Where he had pressed down around his neck,
3     because it was swelling.
4  Q. Tell me and describe as best you can what you
5     saw on Candy Man's neck when you got there.
6  A. Whelps.
7  Q. Welts?
8  A. Whelps. Like a mark or hand print or like a
9     mark like the arm or something. There was a
10    big whelp right in there.
11 Q. Well, did you see a hand print or an arm
12    print?
13 A. Best I see, I seen a big whelp around the neck
14    where it was swelling at.
15 Q. So you saw something on his neck, but you
16    don't know if it was a hand print or an arm
17    print?
18 A. Well, I see -- Well, to me, it's a arm print
19    because it was big and wide right there. It
20    wasn't like fingerprints, because I know
21    because somebody had choked me before. It was
22    something like he had an arm right in there.
23 Q. What did this whelp look like on his neck?

Page 20

1  A. The way he was sweating, he had looked like it
2     was swelling. All the sweat and snot, he
3     looked like he was swelling. I wanted him to
4     take off the handcuffs so I can try to get him
5     somewhere.
6  Q. How far were you away from Candy Man when you
7     saw this swelling on his neck?
8  A. I was right up to him and Curt Campbell, from
9     about this far apart looking down at him
10    talking to Curt to turn him aloose and holding
11    his head up and looking him in the face.
12 Q. You're holding your hands saying this far
13    apart.
14 A. About this far apart.
15 Q. She needs to know a distance to write that
16    down.
17 A. Well, maybe 2 foots.
18 Q. What happened after you got there and saw that
19    swelling on his neck and told Curt Campbell to
20    let him go?
21 A. Curt Campbell -- All the motion going on, and
22    I asked him what was going on, and he wouldn't
23    let him go right then. After everything --

Page 21

1   About five or six minutes, then he finally
2   turn him aloose.
3   Q. Did you have any talk with Officer Campbell in
4     this five or six minutes before he turned him
5     loose?
6   A. I asked him -- I said, why -- I asked him --
7     Travis right there told me right there in
8     front of Curt that Curt said that he going to
9     put your son to sleep. And I asked Curt -- I
10    said -- He said, I said that because I was
11    holding him like that, the way you supposed to
12    do; I told him I'd put him to sleep, and I
13    just pressed him a little bit. And he told me
14    he was going to put him to sleep. That's what
15    Curt told me, me and Travis Searight right
16    there.
17  Q. So Officer Campbell told you he was going to
18    put Candy Man to sleep?
19  A. He told me he told Candy Man he was going to
20    put him to sleep, because everybody else
21    around the table telling me -- I mean, around
22    the thing telling me that -- They told Curt
23    not to hurt Candy Man. Curt, you choking him;

Page 22

1   you hurting him. Candy Man was about to pass
2   out. That's what everybody down there told
3   me.
4   Q. I'm sorry. Said he was going to what?
5   A. The witnesses told me that Candy Man -- I
6     wasn't there -- said Curt had him and was
7     choking him and said it looked like he was
8     fading away, like he going to kill him.
9   Q. What witnesses told you it looked like that he
10    was going to fade away and that he was being
11    killed?
12  A. Travis, Laura, Melissa, my brother Pap,
13    Jeanette, the one they call Dually. Everybody
14    around there told me that. Everybody at the
15    scene told me that, and they told me that
16    right there in their face.
17  Q. Did any of these people that said it looked
18    like Officer Campbell was going to kill Candy
19    Man do anything to intervene?
20  A. I didn't understand your question, sir.
21  Q. Did any of these people that told you that
22    they thought Officer Campbell was going to
23    kill Candy Man by choking him, did you see

Page 23

1   them do anything to try to stop him or did
2   they tell that you they had done anything to
3   try to stop Officer Campbell from doing
4   anything to Candy Man?
5   A. No, sir. But they told me -- they told
6     Officer Campbell, said, Curt, you better turn
7     him aloose because you're going to kill him.
8   Q. He didn't kill him, did he?
9   A. Well, if he hadn't turned him aloose he
10    probably would.
11  Q. How do you know that?
12  A. I wouldn't know, but --
13  Q. He turned loose of him before you got there,
14    didn't he?
15      MR. LEWIS: Object to the form. Go
16    ahead.
17  A. Yes, sir. Because I didn't see that part.
18  Q. In fact, you didn't see any of this bit when
19    Officer Campbell was having to get control of
20    Candy Man, did you?
21      MR. LEWIS: Object to the form.
22  A. Only I see Officer Campbell had him down and
23    he was sweating. And when I got closer to

Page 24

1   him, I see his neck swelling up. That's all I
2   see.
3   Q. So you saw Candy Man was sweating when you got
4     there?
5   A. His neck was swelling up and he had snot
6     running out his nose. He was crying.
7   Q. Did you say something about him being sweaty
8     or did I misunderstand you?
9   A. His clothes were with slob and sweat, you
10    know, from the crying. It mess up your
11    clothes. And his shirt was messed up. He had
12    on a T-shirt.
13  Q. You don't know or -- Let me rephrase that.
14    You didn't see him fighting with Officer
15    Campbell, did you?
16  A. No, sir.
17  Q. You don't know what he was doing before
18    Officer Campbell got there, do you?
19  A. No, sir.
20  Q. Did he tell you that he had been running
21    around in the project before Officer Campbell
22    got there?
23  A. No, sir.

Page 25

1  Q. Let me backtrack a little bit here,
2     Mr. Searight. You said you got down there and
3     immediately saw the swelling on the neck, and
4     you told Officer Campbell to turn Candy Man
5     loose; is that right?
6  A. Yes, sir.
7  Q. Now, what happened right after you told
8     Officer Campbell to turn him loose?
9  A. He didn't turn him loose right then.
10 Q. Did Officer Campbell say anything to you at
11    that time?
12 A. Well, he told everybody else to get back. And
13    my wife was talking, and I told her to stay --
14    you stay right there. I said, I can handle
15    this myself; I know Curt. Basically he was
16    saying something, but he didn't turn him
17    aloose. He sat there a few more minutes, and
18    then basically in a little bit he turned him
19    loose. My wife was taking him back to the
20    house, my son. I asked Curt what went on, and
21    I said, what charge made you did that? He
22    said, well, when he get a report, he'll send
23    me one. Said when he write up something,

Page 26

1     he'll send me one.
2  Q. During this time, during this five or six
3     minutes when you were standing there after you
4     told Officer Campbell to turn Candy Man loose
5     and before he turned him loose, did you hit
6     your son or pop him in the back of the head or
7     in the back to get him to calm down?
8  A. No, sir. I was rubbing my son.
9  Q. Pardon me?
10 A. I was rubbing my own son.
11 Q. You were --
12 A. I was rubbing him. He was crying already. I
13    didn't hit him.
14 Q. Have you ever spanked him?
15 A. On occasion.
16 Q. What else was said between you and Officer
17    Campbell during this period of time before he
18    turned Candy Man loose?
19 A. He basically was telling me he was being
20    disrespectful to him, throwing up a bird. And
21    I told him I deal with my son when I get him
22    to the house.
23 Q. How were you going to deal with him when you

Page 27

1     got to the house?
2  A. I was going home and talk to him. But on my
3     way going to the house, his neck was hurting
4     and he was gasping for his wind. He couldn't
5     hardly breathe.
6  Q. Do you know why he was gasping?
7  A. Because his neck was swelling.
8  Q. While all this was going on, did you hear your
9     son cussing at Officer Campbell?
10 A. No, sir. You had many people down there
11    talking. I didn't hear nothing like that.
12 Q. You didn't -- Are you saying that your son
13    didn't cuss at Officer Campbell or are you
14    just saying you didn't hear him cuss at
15    Officer Campbell?
16 A. I'm saying I didn't hear nobody cuss Officer
17    Campbell.
18 Q. Is it possible he did that while all this was
19    going on and you didn't hear it?
20        MR. LEWIS: Object to the form.
21 A. I didn't hear nobody cuss Officer Campbell.
22 Q. Did you hear him threaten to kill Officer
23    Campbell?

Page 28

1  A. I didn't hear nobody cuss Officer Campbell.
2  Q. Pardon me?
3  A. I didn't hear nobody cuss Officer Campbell.
4  Q. Did you hear Candy Man say, I'm going to kill
5     you?
6  A. No, sir. I didn't hear nobody tell Officer
7     Campbell they going to kill him.
8  Q. Did at any point in time on that evening you
9     hear Candy Man cussing at Officer Campbell?
10 A. No, sir. I didn't hear nobody cuss Officer
11    Campbell.
12 Q. Did at any time that evening you hear Candy
13    Man say, I'm going to kill you, or threaten to
14    kill him?
15 A. No, sir. I didn't hear nobody say they are
16    going to kill Officer Campbell.
17 Q. Did anybody tell you that Candy Man did not
18    shoot a bird at Officer Campbell?
19 A. Well, didn't nobody tell me -- he told me he
20    was shooting a bird at his auntie. His auntie
21    is my sister, and he always do that.
22 Q. You let him get away with shooting birds at
23    your sister?

Page 29

1  A. I'm not going to choke the neck for all that.
2  Q. That's not a good thing to do, is it?
3     MR. LEWIS: Object to the form.
4  A. Well ...
5  Q. Which sister was this that he told you that he
6     was shooting the bird at?
7  A. Willie Nell.
8  Q. He didn't deny shooting a bird that evening,
9     did he?
10 A. No, sir.
11 Q. How did you and Candy Man get back to your
12    house?
13 A. Me and my wife hold him around the waist
14    because he couldn't catch no air and took him
15    home and laid him down. Then he got a little
16    worse, and we called the rescue squad.
17 Q. You said you had him caught around the waist.
18    What do you mean by that?
19 A. She had him on one side and I had him on one
20    side.
21 Q. He was walking, wasn't you?
22 A. Yeah. He was walking slow. He couldn't catch
23    air.

Page 30

1  Q. What happened when you got home?
2  A. We laid him down.
3  Q. Why did you lay him down?
4  A. Laid him down in there and put a pillow up
5     under his head and cleared up his face where
6     all the slob and everything that -- after
7     being choked and by he trying to catch air
8     back again and clean him up a little bit.
9  Q. Now, you keep saying all this slob and
10    everything else was from getting choked, but
11    you don't know that for a fact, do you?
12 A. Well, I know -- the only thing I know, I see
13    snot running and slob coming out his mouth.
14 Q. And when somebody is fighting and crying and
15    carrying on and hollering and mad, they get
16    slobber and sweat on their face too, don't
17    they?
18    MR. LEWIS: Object to the form.
19 A. Well, I experienced it my own self because I
20    have been choked before by a bigger person. I
21    slobbed, and it hurt me real hard.
22 Q. But you didn't actually see that happen to
23    know that that was where it all came from, did

Page 31

1     you?
2  A. Well, no, sir.
3  Q. When you got back to the house, you and your
4     wife and Candy Man, whose decision was it to
5     call for an ambulance?
6  A. It was both of us decision because we see our
7     son laying down there on the couch trying to
8     catch a breath, and his neck was swelling. I
9     got some alcohol and kind of rubbed his neck
10    because for him to feel better.
11    MR. LEWIS: He just asked you whose
12       idea it was. All right?
13    THE WITNESS: Yes, sir.
14 Q. What ambulance did you call?
15 A. Hayneville.
16 Q. Hayneville?
17 A. I reckon. I didn't call.
18 Q. Who called?
19 A. My wife had somebody call.
20 Q. Have you got a phone in your house?
21 A. No, sir.
22 Q. Got a cell phone?
23 A. No, sir.

Page 32

1  Q. Does your wife have a cell phone?
2  A. No, sir.
3  Q. Any of your daughters have a cell phone?
4  A. No, sir.
5  Q. You just know your wife told somebody to call
6     the ambulance for you?
7  A. Yes, sir.
8  Q. Do you know what ambulance company it was that
9     showed up?
10 A. Hayneville, I reckon.
11 Q. How long was it before they got there?
12 A. I expect 25 to 30 minutes.
13 Q. Who talked to the ambulance people when they
14    got there?
15 A. My wife.
16 Q. What did she tell them?
17 A. I don't know, sir, because I was in the house
18    with my son.
19 Q. Did Candy Man talk with the ambulance people
20    to your knowledge?
21 A. Not to my knowledge. My wife was with them.
22 Q. Pardon me?
23 A. My wife was with them.

Page 33

1  Q. How did Candy Man get out of the house?
2  A. They got him out.
3  Q. How did they get him out?
4  A. They pulled the little bed thing up to the
5     door and picked him up and laid him in there.
6  Q. What all did they do with him when they put
7     him on that little bed thing?
8  A. They put a brace around his neck.
9  Q. Anything else?
10 A. They put him in the rescue car.
11 Q. Where did they take him?
12 A. To the hospital, Stabler.
13 Q. Stabler Hospital in Greenville?
14 A. Yes, sir.
15 Q. Did you go to the hospital too?
16 A. She rode with him and I came later.
17 Q. How much later was it that you got there?
18 A. Maybe three minutes after they got there.
19 Q. Do you know what procedures or examination or
20    anything they did with Candy Man while he was
21    there at the hospital?
22 A. They give him a X-ray and check his neck out
23    and give a prescription and told us to follow

Page 34

1     up to a doctor and take him to a doctor. We
2     took him two days later.
3  Q. What did they tell you, if anything, was wrong
4     with Candy Man?
5  A. His neck was bruised.
6  Q. Anything else?
7  A. We should follow up with his doctor.
8  Q. What doctor did you take him to?
9  A. Dr. Garth.
10 Q. How do you spell his name?
11 A. I don't know how to spell his name.
12 Q. Pronounce it again for me.
13 A. Dr. Garland (phonetic).
14 Q. Garland?
15 A. Garland.
16 Q. Where is his office?
17 A. Fort Deposit.
18 Q. When did you take him to see him?
19 A. A couple of days later. He only come on
20    Tuesday.
21       MR. LEWIS: Let me see if I
22          understand it. Is it Gaugin,
23          G-A-U-G-I-N, in Montgomery?

Page 35

1       MRS. SEARIGHT: Golden.
2       THE WITNESS: Dr. Golden.
3       MRS. SEARIGHT: Golden.
4       MR. LEWIS: I just wanted to
5          straighten that out.
6       COURT REPORTER: Say that again.
7          Gogan?
8       MR. DUKES: Golden, G-O-L-D-E-N; is
9          that correct?
10      MRS. SEARIGHT: It's G-O-L-O-M-B.
11      MR. LEWIS: Oh, Phillip Golomb.
12 Q. The day all this happened on, was it a Sunday?
13 A. I don't know, but it was during the summer.
14 Q. If the incident report said that it happened
15    on May 15 of 2005, would you have any reason
16    to dispute that?
17 A. No, sir.
18 Q. Do you recall about what time in the evening
19    it happened?
20 A. It was between seven and seven-thirty.
21 Q. Getting back to what we were talking about,
22    you said you took Candy Man to Dr. Golomb on
23    Tuesday, two days after this; is that correct?

Page 36

1  A. Yes, sir.
2  Q. What kind of examination or test did
3     Dr. Golomb do?
4  A. He examined his neck and got -- took him to
5     the lab and took a X-ray of his neck and give
6     some medication.
7  Q. What kind of medication did he give?
8  A. He give something for the swelling and
9     something for pain.
10 Q. Do you remember what the medication was?
11 A. No, sir. I can't recall that.
12 Q. Where did you take the prescriptions to get
13    them filled?
14 A. At Fort Deposit.
15 Q. Where in Fort Deposit?
16 A. Drugstore.
17 Q. What's the name of the drugstore in Fort
18    Deposit?
19 A. I don't know, sir.
20 Q. What did Dr. Golomb tell you was wrong with
21    Candy Man, if anything?
22 A. His neck had been bruised and he had pain.
23    Watch him -- Watch the swelling and everything

Page 37

1    and bring him back the next Tuesday.
2  Q. Did you bring him back the following Tuesday?
3  A. Yes, sir.
4  Q. How many times did you take him to Dr. Golomb?
5  A. To my recommend [sic], three to four times.
6     We made an appointment and I took him back.
7  Q. Pardon me?
8  A. We give him an appointment every time I took
9     him to bring him back.
10 Q. Did you take him to any doctors other than
11    Dr. Golomb?
12 A. No, sir.
13 Q. Did Dr. Golomb put any restrictions on what he
14    could do after he saw him the first time?
15 A. Explain that question again because I don't
16    understand what you're saying.
17 Q. Did Dr. Golomb say Candy Man shouldn't do
18    anything like play football or basketball or
19    baseball or anything like that after he went
20    to see him?
21 A. No, sir.
22 Q. Did Candy Man go back to doing pretty much
23    what he had been doing before, after he went

Page 38

1     to see Dr. Golomb?
2  A. No, sir. Because he -- No, sir.
3  Q. What was different?
4  A. Dr. Golomb told him we couldn't let him go
5     back to school in two weeks. Kept him out of
6     school for two weeks because his neck stay
7     hurting.
8  Q. Dr. Golomb said he couldn't go back to school
9     for two weeks?
10 A. Yes, sir.
11 Q. It wasn't because he had been suspended or
12    expelled, was it?
13 A. No, sir.
14 Q. Do you know how much his medical bills were
15    for the emergency room at Stabler Hospital?
16 A. No, sir.
17 Q. Do you know how much his bills were for
18    Dr. Golomb?
19 A. No, sir.
20 Q. Who paid for his medical treatment at the
21    hospital and by Dr. Golomb?
22 A. We had Medicare insurance.
23 Q. Has Medicare made a claim to be repaid for

Page 39

1     anything they paid for Candy Man's medical
2     treatment?
3  A. No, sir.
4  Q. What grade in school is Candy Man?
5  A. He was in the sixth then.
6  Q. Is he in the seventh now?
7  A. Yes, sir.
8  Q. How many grades has he had to repeat?
9  A. Two.
10 Q. What grades were those?
11 A. First and second, I think.
12 Q. Why did he have to repeat those grades?
13 A. He a slow learner just like me.
14 Q. Has Candy Man had any behavioral problems at
15    school?
16 A. Yes, sir.
17 Q. How many times has he been expelled or
18    suspended from school?
19 A. Maybe six or seven times.
20 Q. Any of those for fighting?
21 A. Mostly talking in class, and they give him a
22    day or two.
23 Q. Has he ever been expelled for fighting?

Page 40

1  A. He have been sent home a day because the other
2     boy was fighting and he give both of them a
3     day.
4  Q. How many times has he been sent home for
5     fighting?
6  A. I can't recall that because -- I really
7     wouldn't know because I don't be at home.
8     Usually they'll give him a day -- expel him
9     for a day. Sometime he don't be fighting.
10    Just like he talk in class.
11 Q. Do they send a note home with him or do they
12    call you to come up to the school when he's
13    expelled or suspended?
14 A. He call his mama to come.
15 Q. You didn't go; she went?
16 A. I only went maybe one or two times.
17 Q. So as we're sitting here today, you don't
18    really know how many times he's been expelled
19    or suspended for fighting at school?
20 A. No, sir, I don't.
21 Q. You heard Officer Campbell talk about all
22    these times that he's had trouble or other
23    people have had trouble with Candy Man. Do

**Page 41**

1    you have any reason to dispute what he says
2    about all those incidents?
3  A. Yes, sir, because I ain't never heard nobody
4    say nothing like that about Candy Man.
5  Q. You've never heard of him being in trouble for
6    any of those things?
7  A. No, sir.
8  Q. Are you aware of the time his mama whipped him
9    and his sisters for turning off the lights
10   there in the project?
11 A. I wasn't around.
12 Q. Where were you?
13 A. I can't recall where I was at that time.
14 Q. What kind of medication is Candy Man on now?
15 A. I don't know, sir.
16 Q. Do you know what they are for?
17 A. My wife know that because she give it to him,
18   and then Lakesha give it to him. I wouldn't
19   know.
20 Q. Did you ever ask?
21 A. No, sir, I didn't.
22 Q. Mr. Searight, had you had anything to drink on
23   the day of this incident?

**Page 42**

1  A. No, sir.
2  Q. You didn't have any beer or anything to drink
3    that day?
4  A. No, sir.
5  Q. Were you on any type of medication that day?
6  A. No, sir.
7  Q. Were you on any type of drugs that day?
8  A. No, sir.
9  Q. Are you on any type of medication today?
10 A. No, sir.
11 Q. Is there anything today or any reason or any
12   health problems or anything else that would
13   interfere with your ability to hear and
14   understand the questions I've been asking you?
15 A. No, sir.
16 Q. Is there any reason that you would have
17   trouble today remembering information and
18   answering my questions?
19 A. No, sir.
20 Q. Has Candy Man had any type of mental problems
21   since this incident?
22 A. He been having nightmares, and he's scared of
23   policemen and stuff like that. When he see

**Page 43**

1    them now, he don't want to be -- he get out
2    their way and he don't be around them. He
3    afraid of them now.
4  Q. What kind of nightmares has he had?
5  A. I couldn't tell you, sir, but I know he dream
6    and wake up and sweating and be hollering in
7    his sleep.
8  Q. How often does he have these nightmares?
9  A. During that term he had them every other
10   night.
11 Q. You said that term. What do you mean?
12 A. During the term -- the term the officer choked
13   him. After he got back from the hospital from
14   that, he been having them every night from
15   then.
16 Q. How often does he have them now?
17 A. Maybe -- I couldn't say that because during
18   that term, I was watching him real close. I
19   can't recollect now.
20 Q. I'm sorry. Did you say you were or were not
21   watching him close?
22 A. I said I'm not watching him as close as I was
23   then. I couldn't tell you how many nightmares

**Page 44**

1    he have now.
2  Q. Does he have his own bedroom at y'all's house?
3  A. Yes, sir.
4  Q. Has he been to any doctor, Dr. Golomb or any
5    of the other doctors, to see about any
6    problems -- any mental, nervous or emotional
7    problems?
8  A. He been -- The teacher sent him to the
9    hospital in Dorothy (phonetic).
10 Q. Sent him to where?
11 A. Dorothy.
12 Q. Hospital in Dorothy?
13     MR. LEWIS: Dothan.
14 A. Dothan.
15 Q. What hospital did he go to in Dothan?
16 A. It's a -- it's a -- I can't call the name of
17   it, sir.
18 Q. What did he go to the hospital in Dothan for?
19 A. They wanted to change the medication that he
20   was -- that the peoples up here was giving
21   him. They took him up there and monitor him.
22 Q. Did any doctor recommend that he go to the
23   hospital in Dothan?

Deposition of John A. Searight, Sr.                                          March 3, 2006

Page 45

1   A. No. The mental health doctor did.
2   Q. What mental health doctor?
3   A. Ms. Hand.
4   Q. What mental health?
5   A. Hayneville here.
6   Q. What was he going to mental health in
7      Hayneville for?
8   A. When you're a slow learner, they come by and
9      see all the kids like that.
10  Q. Now, he had been going to mental health then
11     in Hayneville for being a slow learner before
12     this incident ever happened, right?
13  A. Yes, sir, he had been going there.
14  Q. So other than the nightmares you said he was
15     having and not wanting to be around police
16     after this, was there any other change in his
17     behavior?
18  A. His neck hurt him sometime.
19  Q. Does his neck still hurt him now?
20  A. He said off and on. Get stiff sometime.
21  Q. Do you know what causes it to be stiff now?
22  A. No, sir.
23  Q. When did you decide to file a lawsuit?

Page 46

1   A. After I came up there, I wanted my other
2      daughter -- The way I understand it,
3      (unintelligible) ask for help because he had
4      hurt one of my other daughters.
5   Q. Who hurt one of your other daughters?
6   A. Curt Campbell.
7   Q. When did he hurt your other daughter?
8   A. Maybe a year before that time.
9   Q. Which daughter was that?
10  A. We call her Baby Ruth.
11     THE WITNESS: What her real name,
12        Lisa?
13  A. Linda Thigpen.
14     MRS. SEARIGHT: Rolanda Wilson.
15  Q. She's your daughter?
16  A. Yes, sir.
17  Q. How many daughters do you have?
18  A. I don't have but two now. She died from a car
19     wreck.
20  Q. Linda Wilson died?
21  A. Yeah.
22     MRS. SEARIGHT: Rolanda.
23  A. Yolonda.

Page 47

1   Q. Rolanda?
2      MRS. SEARIGHT: Yes.
3   A. Yes. He picked her up -- I was coming up. He
4      was trying to stop a fight, and he picked her
5      up and body slammed her. And I didn't have
6      custody over her, and I told her mama about it
7      and she didn't do nothing about it.
8   Q. She was in a fight?
9   A. With another little girl.
10  Q. And breaking it up, he slammed her to the
11     ground?
12  A. He slammed her to the ground, and he hurt her.
13  Q. Who is Rolanda Wilson's mother?
14  A. Tracey Wilson.
15  Q. When did this happen with Curt Campbell and
16     Rolanda?
17  A. Been a couple of years ago.
18  Q. Did you ever make a complaint with the chief
19     of police?
20  A. No, sir.
21  Q. Did you make a complaint to the mayor?
22  A. No, sir.
23  Q. Did you ever go before the Fort Deposit city

Page 48

1      council and make a complaint about this?
2   A. No, sir. Her mother didn't do nothing about
3      it so -- I didn't have no right because I
4      didn't have custody over her.
5   Q. Did you go to -- This incident involving Candy
6      Man, after it, did you go to the chief of
7      police and make a complaint?
8   A. No, sir. I went to the clerk office, and the
9      clerk office sent me to the DA office. The DA
10     office sent me to the mayor, and the mayor
11     sent me to the chief. And the chief, I give
12     him the complaint.
13  Q. What kind of complaint did you make?
14  A. He told me to tell Candy Man to write down
15     everything what happened and give it to him,
16     and that's what we did.
17  Q. What happened?
18  A. They didn't do nothing about it.
19  Q. When did you give this to the chief of police?
20  A. Probably about two weeks later.
21  Q. Do you have a copy of what you gave him?
22     THE WITNESS: Do we have a copy of
23        that?

Page 49

1  MR. LEWIS: He's asking you
2  questions.
3  A. No, sir. I don't have a copy of it now.
4  Q. Who would have a copy of it?
5  A. Our lawyer would have. And the chief of
6     police.
7  Q. What did the chief of police tell you after
8     this?
9  A. Nobody ever came and told me nothing else.
10 Q. Did you ever follow up with them about it?
11 A. I went down there five or six times, because
12    the first time that she told me -- said, well,
13    we will have something like -- something
14    (unintelligible) and let him know where he was
15    wrong and everything like that. But didn't
16    nobody -- after that, she retired and ain't
17    nobody said nothing else to me.
18 Q. Did you go to the mayor about it?
19 A. I went to the mayor the first one.
20 Q. And what did the mayor do?
21 A. He sent me to the chief.
22 Q. Did you ever follow up with the mayor and say
23    nothing is being done?

Page 50

1  A. I went to the mayor two times.
2  Q. Uh-huh (positive response).
3  A. And the mayor told me the chief hadn't give
4     him the paperwork back yet. So ain't nobody
5     else said nothing else to me no more.
6  Q. Do you know if they investigated it and found
7     that there had been no wrongdoing?
8  A. They haven't investigate nothing, because
9     usually when they do, they be calling in the
10    parents and the officer, but they hadn't did
11    that.
12 Q. When did you decide to file a lawsuit?
13 A. It was -- Like I said, I was giving the mayor
14    time. It was a few weeks later. And I
15    decided if he wasn't going to do nothing about
16    it and my son should have been -- might have
17    been killed or something from him, I'm going
18    to file a lawsuit. That's when I decided.
19 Q. Who decided?
20 A. I did.
21 Q. Did your wife -- Was your wife part of that
22    decision-making process?
23 A. I took it to her, and whatever I say -- I'm

Page 51

1     the man of my house, and that's what she go
2     by.
3  Q. So she does whatever you say because you're
4     the man of the house?
5  A. No. She do what's right.
6  Q. So it was your decision to file this lawsuit
7     and not hers?
8  A. Yes, sir.
9  Q. How much money are you asking for in this
10    lawsuit?
11 A. I'm not asking -- This my lawyer and my son
12    case. They do that right there. Whatever
13    goes on, it's all right with me.
14    MR. LEWIS: Let the record reflect
15    Mr. Searight did not draft the
16    complaint, that I did.
17 Q. Did you discuss with the lawyer how much money
18    you were going to ask for?
19 A. No, sir. We never had no discussion about
20    that.
21 Q. Do you know how much money you're asking for
22    in this complaint?
23 A. Well, my lawyer -- my son --

Page 52

1  Q. Do you know how much money this lawsuit is
2     asking for?
3  A. I told you I don't have much to say about --
4  Q. How much money do you expect to get out of
5     this lawsuit?
6     MR. LEWIS: Object to the form.
7  A. I don't know nothing about nothing like that.
8  Q. What have you done with Candy Man these other
9     episodes where he's gotten in trouble for?
10 A. To my best recollection, he ain't never got in
11    no trouble.
12 Q. As we're sitting here today, it's your
13    understanding that this incident involving
14    shooting the birds is the first time he's ever
15    had any trouble with any of the police in Fort
16    Deposit?
17    MR. LEWIS: Object to the form.
18 A. No, sir.
19 Q. So then you're aware that he's had other
20    incidents dealing with the police in Fort
21    Deposit before this one?
22 A. No, sir.
23 Q. Well, I'm confused now, Mr. Searight. Do you

13 (Pages 49 to 52)

Page 53

1  know that he's had run-ins with the police in
2  Fort Deposit before this incident or do you
3  not know of any?
4  A. No, sir, he haven't, not to my knowledge.
5      MR. DUKES: Thank you very much,
6      Mr. Searight.
7      (Deposition concluded at
8      approximately 4:00 p.m.)
9
     * * * * * * * * * * * *
10
     FURTHER DEPONENT SAITH NOT
11
     * * * * * * * * * * * *
12
13     REPORTER'S CERTIFICATE
14  STATE OF ALABAMA:
15  MONTGOMERY COUNTY:
16      I, Pamela A. Wilbanks, Registered
17  Professional Reporter and Commissioner for the State
18  of Alabama at Large, do hereby certify that I
19  reported the deposition of:
20      JOHN A. SEARIGHT, SR.
21  who was first duly sworn by me to speak the truth,
22  the whole truth and nothing but the truth, in the
23  matter of:

Page 54

1      J.S.,(a minor child by
2      and through his father and
3      next friend, JOHN SEAWRIGHT),
4      Plaintiff,
5      Vs.
6      OFFICER CURT CAMPBELL, in
7      his individual capacity,
8      Defendant.
9      In The U.S. District Court
10     For the Middle District of Alabama
11     Northern Division
12     02:05-CV-928-WKW
13  on Friday, March 3, 2006.
14      The foregoing 53 computer printed pages
15  contain a true and correct transcript of the
16  examination of said witness by counsel for the
17  parties set out herein. The reading and signing of
18  same is hereby waived.
19      I further certify that I am neither of kin
20  nor of counsel to the parties to said cause nor in
21  any manner interested in the results thereof.
22      This 9th day of March, 2006.
23

Page 55

Pamela A. Wilbanks, Registered
Professional Reporter and
Commissioner for the State
of Alabama at Large.